**S. CANTU & SON v. RAMIREZ.**

No. 9906.

Court of Civil Appeals of Texas. San Antonio.

Dec. 23, 1936.

Rehearing Granted Jan. 20, 1937.

Rehearing Denied Feb. 17, 1937.

Kelley, Looney & Norvell and A. J. Ross, Jr., all of Edinburg, for appellants.

John M. Rowland, of McAllen, for appellee.

SMITH, Chief Justice.

S. Cantu & Son, partners, operate a wholesale grocery business at McAllen, in Hidalgo county, and have operated that business there for many years.

During the six years prior to her marriage, some ten years ago, Santos Adame Ramirez, then Santos Adame, operated a retail grocery business, in her own name, in the town of Pharr, in said county, and was a regular customer of the Cantus, partly on credit. When she married Lino F. Ramirez the two together continued the operation of the business in the name of Santos Adame, as before, and likewise continued as customers of the Cantus. Their transactions with the Cantus were partly on credit and partly on cash; their purchases being charged by the Cantus to Santos Adame, and, usually, settled by notes and checks signed by Ramirez, Santos Adame's husband.

When Ramirez died, on January 2, 1933, the Ramirezes owed the Cantus a balance of $958.55, represented by notes, signed by Ramirez, and open accounts. Three days after the death of Ramirez, on January 5, 1933, L. Cantu and his store employee,

Genovevo Pena, called at the home of Santos Adame Ramirez, widow of the deceased Lino, and induced her, one way or another, to execute her note to the Cantus in the amount of $958.55, to cover the Ramirez' debt to the Cantu firm. At the same time Cantu delivered to Mrs. Ramirez the unpaid notes and accounts which the business owed Cantu, aggregating said sum of $958.55. In default of payment of that note Cantu & Son sued Mrs. Ramirez for the amount thereof. Upon a trial by jury judgment was rendered denying recovery upon the note, which was ordered canceled. Cantu & Son have appealed.

Appellee contested liability upon the note on the ground that Cantu had induced her to execute the same by concealment of the true nature of the instrument, and false representations that the paper was to enable her to carry on the business of her deceased husband; that it was a transfer of said business to her, and was an application for future credit. Appellee alleged that her husband had for years transacted business with Cantu, in whom she had complete confidence as a man and friend of her husband and herself; that she was ignorant, illiterate, could neither speak, read, nor write English; that she had had no experience in business, whereas Cantu was an experienced and shrewd business man, of large affairs, and for years had operated his wholesale business over Hidalgo and nearby counties; that Cantu did not offer to explain, nor did he explain, the nature of the paper she had signed, and she did not know or understand its nature or legal effect, and did not and could not read it, nor did Cantu read or undertake to translate or explain it to her; that she was sick in mind and body by reason of her long vigil over her husband during his last illness, and by reason of sorrow over his death; that Cantu, coming in the guise of a friend at that time, took advantage of her condition and her confidence in him, and overreached and deceived her into executing said note.

The jury found that, prior to the time appellee executed the note in suit, L. Cantu represented to her:

1. "That it was a paper which was proper for her to sign to enable her to carry on the business of her husband."

2. "That the paper signed was a transfer of the business to herself."

3. "That the paper signed by her was an application for further credit."

The jury found that each of said representations "materially induced" appellee "to sign the note sued upon."

The jury further found that appellee "did not know that she was signing a note on January 5, 1933, in the sum of $958.55, payable on demand, at the time she signed the note sued upon."

In their first proposition appellants contend that the finding of the jury, that appellee did not know she was signing a promissory note when she signed the note in suit, was not sufficient, within itself, to defeat her liability upon the obligation. We sustain this contention for obvious reasons.

Appellants next attack the further findings of the jury, that Cantu represented to appellee that "the paper signed was a transfer of the business to herself," and was "an application for future credit." Appellants first question the sufficiency of the evidence to sustain said findings.

The testimony in support of those findings was meager, vague, indefinite. Appellee's testimony, bearing directly upon this point, is epitomized in the following testimony of appellee, herself, and of the sister of her deceased husband, who was present at the execution of the note. Appellee testified:

"Q. State whether or not they (Cantu and his clerk) requested you to sign something on that occasion. A. Yes, sir, they told me to sign a paper so that the business could continue in my name.

"Q. Did they mention to you anything about a note in any way on the 5th of January, 1933? A. No, sir, they mentioned that paper for me to sign so they could transfer the business to my name.

"Q. Did you sign that paper because of the confidence you had in Mr. Cantu and Mr. Pena? A. Yes, sir; believing that it was like they were telling me, that it was merely a transfer of the business, so that I could operate it.

"Q. What did you think you were getting at the time they gave you back the two notes and the check, when you signed this note for $958.55? A. They didn't tell me anything at all, they didn't say whether they were checks or notes, they turned the papers over to me, and they told me they were going to transfer the business in my name, so I could continue in my name.

"Q. You mean transfer the credit to your name? A. Yes, I believe it was to transfer the credit to my name.

"Q. For the consideration of doing that, and giving you credit, you signed this paper? A. Yes, Sir; and the confidence that they had offered to help me and to continue to help me.

"Q. And you signed it for that reason? A. Yes, sir; for that reason." (Italics ours).

The only other testimony offered by appellee upon this issue was that of Lucena R. Contreras, sister of appellee's deceased husband, who was present at the time appellee executed the note sued on, who testified as follows:

"Q. What did they say on that occasion? A. That they were coming there to offer their sympathies, and that they were very sorry for the death of her husband.

"Q. Did they say anything else? A. And then they offered to credit her, because the credit was in the name of my brother.

"Q. They offered to give credit to her? A. Yes, sir; to her.

"Q. Anything else? A. Then they got the paper out there, but neither my sister-in-law nor myself understood English.

"Q. Do you remember what they said when they produced this paper they wanted her to sign? A. Yes sir.

"Q. What did they say? A. They just came there to offer their aid to her and offer her credit, the same way as my brother had had credit.

"Q. Did they say all of that? A. Yes, sir.

"Q. State whether they told her what was in the paper. A. No, sir; they just was telling her they could continue doing, business with her, and she could continue doing business with them because my brother was the one that was doing the business.

"Q. Do you remember that they repeatedly told her that she could do business with them like her husband had been doing? A. Yes, sir; they offered her the business, and they offered to help her in the same way they had been helping my brother." (Italics ours).

We are of the opinion that this testimony, when construed with other and undisputed facts in the case, does not establish such fraud upon the part of appellants as would warrant the judgment in this case. The record at large establishes, conclusively, that appellee, for six years separately, and her husband and herself for the ensuing eight years, had operated their business upon their credit with appellants; that during the last eight years this credit had been sustained by open accounts paid on the checks of the husband, and by notes executed by him, and that at the time of the husband's death the business owed appellants $958.55, in notes and accounts; that upon the husband's death appellants explained and represented to appellee that in order for appellee to continue the business upon the credit theretofore sustained by the husband it would be necessary for her to settle the past due notes and accounts; by executing the note in suit, and thereby secure a transfer of that business, and a continuation thereof, in her name, upon the credit theretofore extended her husband. It was upon those representations and considerations that appellee executed the note. There was no jury finding that such representations were untrue, and yet such finding was essential to a judgment in this case, the burden resting upon appellee to elicit it.

In our opinion, the evidence, and the findings thereon, in the light of the record at large, do not establish such a case of fraud as would warrant the judgment of cancellation. Charges of fraud must be established by clear and specific evidence, which may not be aided by presumptions or inferences, or intendment. The evidence and findings of the representations complained of in this case are vague, indefinite, and inconclusive, and, moreover, are so qualified by the testimony of appellee and her sister-in-law, upon which her case rests, as to rob them of the implications of active fraud necessary to destroy a written contract.

The original opinion in this case will be withdrawn, and this substituted in lieu thereof.

The judgment is reversed and the cause remanded.