**Affirmed and Opinion filed May 21, 2013.**



In The

# Fourteenth Court of Appeals

## NO. 14-12-00658-CV

**REHAK CREATIVE SERVICES, INC. AND ROBERT REHAK, Appellants**

**V.**

**ANN L. WITT, ELLEN WITT, RAYMOND WITT AND ANN WITT CAMPAIGN, Appellees**

**On Appeal from the 215th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2012-25062**

## O P I N I O N

Rehak Creative Services, Inc. and Robert Rehak (collectively, "Rehak") appeal from a final judgment granting a motion to dismiss in favor of appellees Ann L. Witt, Ellen Witt, Raymond Witt, and the Ann Witt Campaign (collectively, "Witt"). We affirm.

### OVERVIEW

This appeal focuses on a recently enacted statute called the "Texas Citizens Participation Act," which is codified in Chapter 27 of the Civil Practices and

Remedies Code under the heading "Actions Involving the Exercise of Certain Constitutional Rights." *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 27.001-.011 (Vernon Supp. 2012). This statute is an anti-SLAPP law, which is an acronym for "Strategic Lawsuits Against Public Participation." *See generally In re Lipsky*, No. 02-12-00348-CV, 2013 WL 1715459, at *1 n.1 (Tex. App.—Fort Worth April 22, 2013, orig. proceeding).

Chapter 27 seeks to "encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time protect the rights of a person to file meritorious lawsuits for demonstrable injury." Tex. Civ. Prac. & Rem. Code Ann. § 27.002. It does so by establishing a mechanism for early dismissal of lawsuits that threaten the right of free speech, the right to petition, or the right of association. The statute is to be "construed liberally to effectuate its purpose and intent fully." *Id*. § 27.011(a).

We must apply this statute to a libel claim and other causes of action asserted in connection with a political campaign for a seat in the Texas Legislature.

## FACTUAL BACKGROUND

Ann L. Witt ran unsuccessfully in the 2012 Republican primary for House District 133. The Ann Witt Campaign was designated as Witt's campaign committee under the Texas Election Code. *See* Tex. Elec. Code Ann. § 251.001(13) (Vernon 2010). Raymond Witt served as campaign treasurer. Ellen Witt maintained campaign websites.

Ann Witt's opponent, incumbent Representative Jim Murphy, first was elected to represent House District 133 in 2006 for a term to begin on January 1,

2

2007.[1]  Murphy served from 1997 through 2006 as president of a "municipal management district" on Houston's west side called the Westchase District.  This entity seeks to "promote, develop, encourage, and maintain employment, commerce, economic development, and the public welfare in the commercial areas of municipalities and metropolitan areas of this state."  Tex. Local Gov't Code Ann. § 375.001(b) (Vernon 2005).  The Westchase District is a political subdivision of the state.  *Id*. § 375.004(a).  Murphy received a state salary as president of the Westchase District.

Members of the Texas Legislature cannot hold "any other office or position of profit under this State."  Tex. Const. art. XVI, § 40(d).  Before running for the legislature, Murphy sought an opinion from the Texas Attorney General addressing whether he could serve simultaneously as president of the Westchase District and in the legislature.

Texas Attorney General Greg Abbott issued an opinion concluding that the Texas Constitution prohibits an individual from serving simultaneously as a municipal management district employee and a legislator.  *See* Tex. Att'y Gen. Op. No. GA-386 (2005).  The attorney general also opined that a person working as an "independent contractor" for a governmental entity does not hold a "position of profit under this State"  *Id*.  The opinion stated:  "We conclude that article XVI, section 40(d) of the Texas Constitution does not prohibit a member of the Texas Legislature from also working for compensation as an independent contractor for a municipal management district."  *Id*.  The opinion further stated:  "The determination that a person actually works as an independent contractor and not as an employee involves questions of fact and contract interpretation, which cannot

---

[1]  Murphy lost the seat in 2008.  He was elected again to represent House District 133 in 2010, and re-elected in 2012.

3

be resolved in the opinion process." *Id*.

Murphy created a limited liability company called District Management Services, LLC in December 2006. Murphy is the LLC's sole member. Murphy resigned his position with the Westchase District as of December 31, 2006.

Effective January 1, 2007, the Westchase District entered an Administrative and Management Services Agreement with District Management Services, LLC. Each year since 2007, the district and the LLC have entered a similar one-year contract with a January 1 effective date. The LLC performs consulting services under these annual agreements to act as the district's general manager in return for compensation including a fixed monthly fee. Each annual agreement identifies the LLC as an "independent contractor." The agreements prohibit Murphy from awarding work to, supervising, or approving the work of other contractors.

During the 2012 Republican primary for House District 133, Witt accused Murphy of acting to "sidestep" the Texas Constitution by serving in the legislature while receiving payment as a consultant to the Westchase District via contracts with District Management Services, LLC. Witt leveled this and many other accusations against Murphy on a Witt campaign website called "How to Succeed in Government Without Really Trying."

The Witt campaign's main website was http://voteannwitt.com. The main campaign website provided a link to the separate "How to Succeed" website at http://howtosucceedingovernment.com. The Witt campaign also placed radio advertisements and distributed mailers directing potential voters to the "How to Succeed" website. Versions of the "How to Succeed" website were accessible from mid-April 2012 until June 7, 2012.

The website explains that "*How to Succeed in Business Without Really*

*Trying* is a book, broadway musical, and movie about climbing the corporate ladder." It continues: "The main character, J. Pierrepont Finch, outwardly appears to be a very likeable chap, but really he is using every trick in the book to get ahead at the expense of others." The website then casts Murphy in the role of Finch: "In Texas government, J. Pierrepont Finch is Jim Murphy: likeable guy, but he's using every trick in the book – really, he could write the book – to make money off of government and further his own political ambition."

The following statement appears below the website's "How to Succeed" heading and next to a large picture of Murphy: "How Jim Murphy is ripping off taxpayers." The website states, "For professional politician Jim Murphy, it takes just 6 sleazy steps."

The website's content changed over time. In one version of the "How to Succeed" website, the six steps are identified as follows.

- "STEP 1: Oversee a Government Body."

- "STEP 2: Hire yourself as General Manager."

- "STEP 3: Make $290,000 a year off taxpayers."

- "STEP 4: Sidestep the Texas Constitution."

- "STEP 5: Get a second government job."

- "STEP 6: Reward your supporters."

In another version, the six steps are identified with somewhat different wording.

- "STEP 1: Help create a new taxing entity."

- "STEP 2: Hire yourself as its top bureaucrat."

- "STEP 3: Make $290,000 a year off taxpayers."

5

- "STEP 4: Sidestep that pesky Texas Constitution."

- "STEP 5: Get a second government job."

- "STEP 6: Reward your supporters with government contracts."

In these iterations of the "How to Succeed" website, each "step" contains additional text and a link to click on for "MORE INFO." The following words appear at the bottom of the screen: "Double Dipping. Skirting the Law. Bilking Taxpayers. Rewarding Cronies. It's time to end Jim's run."

The dispute here focuses primarily on Step 6 and its accompanying text.

One version of the "How to Succeed" website contains this statement under Step 6: "Westchase District has awarded government contracts to the following companies, and the CEOs of these companies have contributed more than $48,000 in cash and services to Jim's campaigns for State Representative. (Copies of these contracts have been requested of the Westchase District.)" The website lists six companies under this text.

The second company listed under Step 6 is an advertising agency named "Rehak Creative Services." The agency's chief executive officer and sole owner is Robert Rehak. He contributed $3,250 to Murphy's campaign for House District 133 in 2005-2006 and another $3,750 to Murphy's subsequent campaigns through 2011. Rehak's contributions to Murphy's campaigns for four election cycles totaled $7,000.

The website's entry for Rehak Creative Services, Inc. reads as follows: "$9,750 from Robert Rehak, CEO of Rehak Creative Services. Rehak Creative Services received a government contract from the Westchase District to design its Long Range Plan (see p. 55). And the company lists Westchase District as a client." Three links appear under the second entry: "*Click here for contributions*,"

6

"*Click here for Westchase Long Range Plan*," and "*Click here for Rehak client list*." According to Rehak's appellate brief, "Readers who followed the links under the statements about Rehak and RCS were directed to a list of Rehak's contributions to Murphy's campaigns since 2005, a copy of a 55-page long-range planning report for the Westchase District produced by RCS, and the trademarked logos of some of RCS' clients from RCS' website."

A later version of the "How to Succeed" website revised the text referencing Rehak Creative Services, Inc. under Step 6 to state as follows:

> Jim Murphy has awarded $1.3 million in Westchase District government contracts to his State Representative campaign contributors.
>
> Westchase District has awarded $1.3 million worth of government contracts to the companies below, and the CEOs of those companies have contributed more than $45,000 in cash and services to Jim's campaigns for State Representative. (Copies of these contracts were obtained by Public Information Act request to Westchase District.)
>
>         *                *                *
>
> Rehak Creative Services has received government contracts from Westchase District totaling more than $50,000. The company's CEO, Robert Rehak, has contributed $7,000 to Jim's campaigns.
>
> *Click here for contributions>>*
> *Click here for contract #1>>*
> *Click here for contract #2>>*
> *Click here for contract #3>>*
> *Click here for contract #4>>*

According to Rehak, "[T]he documents that the Witts represented as supporting their accusations that Rehak and RCS received 'rewards' and participated in a scheme to 'bilk taxpayers,' in fact, showed the exact opposite." Rehak contends: "People, who knew and worked with Rehak and RCS, and who read the core

7

website from being directed to it by the main campaign website, the radio ads or the mailers, believed the campaign literature, including the Defamatory Post, was accusing Rehak and RCS of wrongdoing, and of possible criminal behavior."

The Witt campaign refused repeated requests for a retraction, and for removal of all references to Rehak and Rehak Creative Services, Inc. from the "How to Succeed" website.

## PROCEDURAL BACKGROUND

Rehak sued Witt on April 30, 2012 and asserted claims for libel; business disparagement; tortious interference with business relationships and prospective business opportunities; intentional infliction of emotional distress; civil conspiracy; conversion; and misappropriation. Rehak based these claims on Witt's actions in connection with the "How to Succeed" website, including the alleged misuse of trademarked logos belonging to clients of Rehak Creative Services, Inc.

Witt timely filed a motion to dismiss all of Rehak's claims under Chapter 27. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.003(b). Witt filed a response and included supporting affidavit evidence; Rehak objected to certain portions of the affidavits. Neither side sought discovery. *See id*. § 27.006(b).

The trial court conducted two hearings. In accordance with the parties' agreement, the trial court decided the motion based upon the pleadings; motion; response; arguments of counsel; and affidavits. *See id*. §§ 27.004, 27.006(a). The trial court signed an order denying Witt's objections to affidavits Rehak proffered as part of his response to the motion to dismiss. It also signed a "Final Judgment of Dismissal" that dismissed all claims asserted by Rehak and awarded attorney's fees to Witt. *See id*. § 27.009(a)(1). Rehak timely appealed. *See id*. § 27.008(c).

8

## I.    Chapter 27 Dismissal Mechanism

We begin with a summary of Chapter 27's dismissal mechanism.

This statute allows a litigant to seek dismissal of a "legal action" that is "based on, relates to, or is in response to a party's exercise of the right of free speech, right to petition, or right of association . . . ." *Id*. § 27.003(a).

A "'legal action' means a lawsuit, cause of action, petition, complaint, cross-claim, or counterclaim or any other judicial pleading or filing that requests legal or equitable relief." *Id.* § 27.001(6). The "'[e]xercise of the right of free speech' means a communication made in connection with a matter of public concern." *Id.* § 27.001(3).

A "'[c]ommunication' includes the making or submitting of a statement or document in any form or medium, including oral, visual, written, audiovisual, or electronic." *Id.* § 27.001(1). Among other things, a "'[m]atter of public concern' includes an issue related to . . . environmental, economic, or community well-being . . . . the government . . . [or] . . . a public official or public figure . . . ." *Id.* § 27.001(7)(B), (C), (D).

The motion seeking dismissal "must be filed not later than the 60th day after the date of service of the legal action." *Id.* § 27.003(b). The trial court can extend this deadline for good cause. *Id.* The filing suspends all discovery pending a ruling on the motion unless the trial court allows "specified and limited discovery relevant to the motion" upon "a showing of good cause." *Id.* § 27.006(b).

The trial court must set a hearing on the motion "not later than the 30th day after the date of service of the motion unless the docket conditions of the court require a later hearing." *Id.* § 27.004. The trial court must rule on the motion "not

later than the 30th day following the date of the hearing on the motion." *Id*. § 27.005(a). "If a court does not rule on the motion to dismiss under Section 27.003 in the time prescribed by Section 27.005, the motion is considered to have been denied by operation of law and the moving party may appeal." *Id*. § 27.008(a).

Chapter 27 employs a burden-shifting mechanism. With one exception quoted below, the trial court "shall dismiss a legal action against the moving party if the moving party shows by a preponderance of the evidence that the legal action is based on, relates to, or is in response to the party's exercise of . . . the right of free speech . . . ." *Id*. § 27.005(b)(1). The exception: "The court may not dismiss a legal action under this section if the party bringing the legal action establishes by clear and specific evidence a prima facie case for each essential element of the claim in question." *Id*. § 27.005(c). Chapter 27 does not define the phrases "clear and specific evidence" or "prima facie case."[2]

## II.    Issues on Appeal

Rehak does not dispute that the claims for libel, business disparagement, tortious interference with business relationships and prospective business opportunities, intentional infliction of emotional distress, and civil conspiracy are based on, related to, and asserted in response to Witt's exercise of  the "right of free speech" under sections 27.003(a) and 27.005(b)(1).[3]  With respect to these

---

[2] Other provisions in Chapter 27 address additional findings; damages and costs; and exemptions. *Id*. §§ 27.007, 27.009, 27.010. Discussion of these provisions is not necessary to resolve this appeal.

[3] Rehak's opening brief contains two different formulations of his sixth issue. One formulation at the brief's beginning says Witt failed "to prove by a preponderance of the evidence that each of the Appellants' claims other than libel and business disparagement were based on, related to, or were in response to the Appellees' exercise of their 'right to free speech' as defined by the statute." As restated in the brief's argument section, Rehak's sixth issue says Witt failed "to prove by a preponderance of the evidence that the Appellants' claims for misuse of RCS'[s] copyrighted materials, and of RCS's clients['] trademarked logos were based on,

claims, the appellate battle focuses on whether Rehak met his section 27.005(c) burden to establish "by clear and specific evidence a prima facie case for each essential element of the claim in question."

In his first five issues, Rehak contends he satisfied section 27.005(c) because the record establishes that Witt's statements on the "How to Succeed" website (1) were "of and concerning" Rehak and Rehak Creative Services, Inc.; (2) were defamatory; (3) created a substantially false and defamatory impression by omitting material facts or juxtaposing facts in a misleading way; (4) were statements of fact rather than opinion; and (5) resulted in damages.

Rehak's last two issues focus on the remaining claims for conversion and misappropriation in connection with copyrighted materials and trademarked logos appearing on the "How to Succeed" website.

In his sixth issue, Rehak contends that Witt did not satisfy her initial burden under section 27.005(b) to establish by a preponderance of the evidence that the conversion and misappropriation claims were based on, related to, or asserted in response to Witt's exercise of the right of free speech.

In his seventh issue, Rehak contends he satisfied his section 27.005(c) burden to establish a "prima facie case" by "clear and specific evidence" with respect to his conversion and misappropriation claims.

## III.   Standard of Review

Chapter 27's recent vintage means that the case law has not yet coalesced around a single, widely accepted formulation of the standard of review for section

related to, or were in response to the Appellees' exercise of their 'right to free speech' as defined by the statute." The argument following this restatement of Issue 6 addresses only conversion and misappropriation. Accordingly, we construe Rehak's Issue 6 to contend that only the conversion and misappropriation claims are not based on, related to, or asserted in response to Witt's exercise of the right of free speech as required under section 27.005(b)(1).

27.005 dismissal orders.

At least one case addressing Chapter 27 has invoked the *de novo* standard of review applicable to issues of statutory construction. *Avila v. Larrea*, 394 S.W.3d 646, 652-53 (Tex. App.—Dallas 2012, pet. filed) (citing *Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010)). *De novo* review governs a question-of-law inquiry concerning the meaning of specific words used in the statute. But invoking the *de novo* standard alone does not fully explain the dismissal standard to be applied when an appellate court determines *de novo* whether (1) the movant satisfied section 27.005(b)'s initial burden; and (2) the non-movant satisfied section 27.005(c)'s shifted burden.

Another case has applied an abuse of discretion standard. *In re Lipsky*, 2013 WL 1715459, at *3, *10-*13. *Lipsky*'s use of this standard arises from a unique procedural posture; that case reached the court of appeals on a petition for writ of mandamus based on an earlier determination by the Second Court of Appeals that Chapter 27 does not authorize an interlocutory appeal from an express order denying dismissal. *Id.*[4] Because Rehak's case does not come to this court via mandamus, we do not apply an abuse of discretion standard to gauge the propriety

---

[4] The Fourteenth Court of Appeals has concluded that Chapter 27 allows an interlocutory appeal regardless of whether the motion to dismiss is determined by an express order or by operation of law. *See Direct Commercial Funding, Inc. v. Beacon Hill Estates, LLC*, No. 14-12-00896-CV, 2013 WL 407029 (Tex. App.—Houston [14th Dist.] Jan. 24, 2013, Order); *see also San Jacinto Title Servs. of Corpus Christi, LLC. v. Kingsley Props., LP.,* No. 13-12-00352-CV, 2013 WL 1786632 (Tex. App.—Corpus Christi April 25, 2013, no pet. h.); Tex. Civ. Prac. & Rem. Code Ann. § 27.008(a), (b), (c). The Second Court of Appeals has reached a contrary conclusion. *See Jennings v. WallBuilder Presentations, Inc.*, 378 S.W.3d 519, 524-29 (Tex. App.—Fort Worth 2012, pet. filed) (interlocutory appeal is permitted under section 27.008 when trial court fails to rule on motion to dismiss, but not when trial court signs express order on dismissal); *see also Lipsky v. Range Prod. Co.*, No. 02-12-00098-CV, 2012 WL 3600014, at *1 (Tex. App.—Fort Worth Aug. 23, 2012, no pet.). This appeal does not require consideration of section 27.008's application to an interlocutory order because the order at issue here operated as a final judgment dismissing all causes of action asserted by Rehak. *See Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 205 (Tex. 2001).

of dismissal under section 27.005.

We agree with the First Court of Appeals that the first step of this inquiry under section 27.005(b) is a legal question reviewed *de novo* on appeal. *Newspaper Holdings, Inc. v. Crazy Hotel Assisted Living, Ltd.*, No. 01-12-00581-CV, 2013 WL 1867104, at *6 (Tex. App.—Houston [1st Dist.] May 2, 2013, no pet. h.) (citing *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625 (Tex. 2008)).

With respect to the second step, Rehak invites us to apply *de novo* review under section 27.005(c) "[b]ecause the motion to dismiss procedure provided in Chapter 27 is the functional equivalent of a no-evidence summary judgment motion . . . ." *See* Tex. R. Civ. P. 166a(i). Rehak further contends that a non-movant seeking to satisfy section 27.005(c)'s burden "must come forward with pleadings and affidavits that contain direct evidence that would provide more than a scintilla of evidence to support each essential element of respondent's claim . . . ." *Cf. Ramsey v. Lynch*, No. 10-12-00198-CV, 2013 WL 1846886 (Tex. App.—Waco May 2, 2013, no pet. h.) (applying legal sufficiency standard from *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005), and factual sufficiency standard from *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g), to trial court's findings of fact under Chapter 27).

We hesitate to embrace the Rule 166a(i) analogy or import into Chapter 27 the "scintilla of evidence" concept applicable in the context of a no-evidence motion for summary judgment. *See, e.g., King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003).

This reluctance stems from Chapter 27's distinct terminology. It is doubtful whether Rule 166a(i)'s no-evidence standard meshes with a Chapter 27 mechanism that demands a showing of "clear and specific" evidence – not just "some" evidence – to avoid dismissal. *Compare* Tex. Civ. Prac. & Rem. Code Ann. §

27.005(c) (non-movant must establish "by ***clear and specific evidence*** a prima facie case for each essential element of the claim in question" (emphasis added) *with Romo v. Tex. Dept. of Transp.*, 48 S.W.3d 265, 269 (Tex. App.—San Antonio 2001, no pet.) ("When a party moves for a no-evidence summary judgment, the nonmovant must produce some evidence raising a genuine issue of material fact."). The purposeful inclusion of a "clear and specific evidence" requirement indicates that the non-movant must satisfy an elevated evidentiary standard under section 27.005(c). We will follow section 27.005(c)'s express (albeit undefined) terminology and leave the "scintilla" to other contexts.

"Clear and specific evidence" has been described as evidence that is "unaided by presumptions, inferences, or intendments." *McDonald v. Clemens*, 464 S.W.2d 450, 456 (Tex. Civ. App.—Tyler 1971, no writ); *see also S. Cantu & Son v. Ramirez*, 101 S.W.2d 820, 822 (Tex. Civ. App.—San Antonio 1936, no writ).

"Prima facie evidence is evidence that, until its effect is overcome by other evidence, will suffice as proof of a fact in issue." *Duncan v. Butterowe, Inc.*, 474 S.W.2d 619, 621 (Tex. Civ. App.—Houston [14th Dist.] 1971, no writ). "In other words, a prima facie case is one that will entitle a party to recover if no evidence to the contrary is offered by the opposite party." *Id*. (citing *Simonds v. Stanolind Oil & Gas Co.,* 134 Tex. 332, 136 S.W.2d 207, 209 (1940)); *see also In re Lipsky*, 2013 WL 1715459, at *4 ("In cases unrelated to motions to dismiss under chapter 27, Texas courts have defined 'prima facie' evidence as the 'minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true.'") (quoting *In re E. I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 223 (Tex. 2004) (orig. proceeding)).

Other circumstances requiring a "prima facie" showing provide apt

14

analogies for section 27.005(c)'s dismissal standard. *Cf. Baker v. Goldsmith,* 582 S.W.2d 404, 408-09 (Tex. 1979) (In bill of review context, "a prima facie meritorious defense is made out when it is determined that the complainant's defense is not barred as a matter of law and that he will be entitled to judgment on retrial if no evidence to the contrary is offered. This is a question of law for the court."). "Because a determination of whether a party has presented prima facie proof of a meritorious claim is a question of law, we review the trial court's decision of this issue de novo." *In re C.E.,* 391 S.W.3d 200, 203 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (citing *Baker*, 582 S.W.2d at 406, and *Nichols v. Jack Eckerd Corp.*, 908 S.W.2d 5, 7-8 (Tex. App.—Houston [1st Dist.] 1995, no writ)); *see also Elliott v. Elliott*, 21 S.W.3d 913, 917 (Tex. App.—Fort Worth 2000, pet. denied).

A *de novo* standard likewise governs review of the trial court's determination regarding the propriety of dismissal under section 27.005. By the term "*de novo*" we mean that the appellate court makes an independent determination and applies the same standard used by the trial court in the first instance. *See, e.g., Duerr v. Brown*, 262 S.W.3d 63, 68 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

To sum up: On appeal from an order decided under section 27.005(c), we determine *de novo* whether the record contains a minimum quantum of clear and specific evidence that, unaided by inferences, would establish each essential element of the claim in question if no contrary evidence is offered. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.005(c); *Duncan*, 474 S.W.2d at 621; *McDonald*, 464 S.W.2d at 456; *see also Newspaper Holdings, Inc.*, 2013 WL 1867104, at *6.

We now turn to the application of these standards.

## IV.    Application of Chapter 27

### A.    Libel and Business Disparagement

Rehak's briefing focuses primarily on his libel and business disparagement claims.  He emphasizes that Witt's "How to Succeed" website "used the terms 'reward,' 'rip-off,' and 'bilk,' to describe the conduct in which Rehak and RCS were alleged to have participated."  Rehak contends:  "The statements that RCS received contracts from the Westchase District, and that Rehak made contributions to Murphy's campaigns as part of a scheme to 'reward' 'cronies' by 'bilking' and 'ripping-off' taxpayers were false and defamatory."  He further contends:  "The false gist of the Witts' statements about the Appellants is that they participated in a scheme to 'rip off' and 'bilk' taxpayers, and to help Jim Murphy to break state law."  According to Rehak, the "How to Succeed" website conveyed a false gist "by juxtaposing true facts, while ignoring, misrepresenting and omitting other material facts."

We address Rehak's contentions in light of the extensive body of law that has developed around claims for libel and business disparagement.

Libel is "a defamation expressed in written or other graphic form . . . ."  Tex. Civ.  Prac. & Rem. Code Ann. § 73.001 (Vernon 2011).  This formulation encompasses writing that appears as text on an internet website.  *See Kaufman v. Islamic Soc'y of Arlington*, 291 S.W.3d 130, 144-45 (Tex. App.—Fort Worth 2009, pet. denied).  A libel plaintiff must prove that the defendant "(1) published a statement; (2) that was defamatory concerning the plaintiff; (3) while acting with either actual malice, if the plaintiff was a public official or public figure, or negligence, if the plaintiff was a private individual, regarding the truth of the

16

statement." *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998).[5] Corporations and individual persons alike can sue for defamation. *See Gen. Motors Acceptance Corp. v. Howard*, 487 S.W.2d 708, 712-13 (Tex. 1972).

Although claims for libel and business disparagement bear some similarity to one another, they are distinct causes of action that protect different interests. A libel action protects "the personal reputation of the injured party, whereas the action for . . . business disparagement is to protect the economic interests of the injured party against pecuniary loss." *Hurlbut v. Gulf Atlantic Life Ins. Co.*, 749 S.W.2d 762, 766 (Tex. 1987). Business disparagement requires proof of "publication by the defendant of the disparaging words, falsity, malice, lack of privilege, and special damages." *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 82 (Tex. 2000); *see also Hurlbut,*, 749 S.W.2d at 766. The words at issue must be defamatory to be actionable as business disparagement. *Delta Air Lines, Inc. v. Norris*, 949 S.W.2d 422, 427 (Tex. App.—Waco 1997, writ denied) (citing *Hurlbut*, 749 S.W.2d at 766).

---

[5] The burden of demonstrating a challenged statement's truth or falsity depends on the litigants' status and the statement's subject matter. In a case brought by a private plaintiff against a nonmedia defendant in connection with a matter that is not of public concern, "[t]he truth of the statement in the publication on which an action for libel is based is a defense to the action." Tex. Civ. Prac. & Rem. Code Ann. § 73.005; *see also Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995) ("In suits brought by private individuals, truth is an affirmative defense to slander."). In contrast, "[A] public official . . . must prove that defamatory statements made about him were false." *Bentley v. Bunton,* 94 S.W.3d 561, 586 (Tex. 2002); *see also id.* at 586 n.62; *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777 (1986) (plaintiff bears burden of proving falsity when defamatory speech is of public concern and defendant is a member of the media; reserving question of who bears the burden when defendant is not a member of the media); *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964) (public figure or public official must prove falsity). Because we resolve this appeal on other grounds, we do not address (1) whether Rehak was a public figure; (2) whether Witt was a media defendant; (3) whether the challenged statements were false; (4) who bore the burden with respect to establishing truth or falsity; or (5) the requisite level of fault necessary to establish liability. We also do not address the nature of any asserted damages attributed to libel or disparagement. *See generally Hancock v. Variyam*, No. 11-0772, __WL __ (Tex. May 17, 2013).

The threshold inquiry focuses on the requirement of a defamatory statement because this element is common to both causes of action.

A statement is defamatory when a person of ordinary intelligence would interpret it in a way that tends to injure the subject's reputation and thereby expose the subject to public hatred, contempt, or ridicule, or financial injury, or to impeach the subject's honesty, integrity virtue, or reputation. Tex. Civ. Prac. & Rem Code. Ann. § 73.001; *see also Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 114-15 (Tex. 2000). This is an objective test. *Miranda v. Byles*, 390 S.W.3d 543, 550 (Tex. App.—Houston [1st Dist.] 2012, pet. filed) (citing *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 157 (Tex. 2004)); *see also Kaufman*, 291 S.W.3d at 145. A statement may be "false, abusive, unpleasant, or objectionable to the plaintiff without being defamatory." *San Antonio Express News v. Dracos*, 922 S.W.2d 242, 248 (Tex. App.—San Antonio 1996, no writ).[6]

"The person of 'ordinary intelligence' described in *Turner* is a prototype of a person who exercises care and prudence, but not omniscience, when evaluating allegedly defamatory communications." *New Times, Inc.,* 146 S.W.3d at 154-55. This person "'is no dullard'" and represents "'reasonable intelligence and learning,'" not "'the lowest common denominator.'" *Id*. (quoting *Patrick v.*

---

[6] Rehak submitted affidavits in the trial court from himself and from "members of the community" who, according to Rehak, "meet the test of being 'ordinary readers' or the 'man on the street.'" Rehak asserts that "[t]hese individuals all perceived the Defamatory Post in its entirety as conveying the false gist that Rehak was being accused of participating in a scheme of theft and bribery involving a public official and a public entity." Because the defamatory meaning inquiry is objective rather than subjective, affidavits containing assertions from Rehak and others regarding their individual subjective perceptions of the validity of his claims are not competent evidence and do not affect the analysis. *See, e.g., Tex. Div.-Tranter, Inc. v. Carrozza,* 876 S.W.2d 312, 314 (Tex. 1994); *see also Vice v. Kasprzak*, 318 S.W.3d 1, 21 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (plaintiff's own characterization of allegedly defamatory statement cannot form the basis for a viable defamation claim).

*Superior Court*, 27 Cal. Rptr. 2d 883, 887 (Cal. Ct. App. 1994)).

Whether the statement at issue is capable of defamatory meaning initially is a question of law for the court. *Turner*, 38 S.W.3d at 114; *Musser v. Smith Protective Servs.*, 723 S.W.2d 653, 654-55 (Tex. 1987). "The court construes the statement as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive the entire statement." *Musser*, 723 S.W.2d at 655. "Only when the court determines the language is ambiguous or of doubtful import should the jury then determine the statement's meaning and the effect the statement's publication has on an ordinary reader." *Id.*; *see also New Times, Inc.*, 146 S.W.3d at 154-55.

This inquiry does not examine individual words in isolation. *Turner*, 38 S.W.3d at 115. Context is important. *See id.*; *see also New Times, Inc.*, 146 S.W.3d at 154-55. "[P]ublications alleged to be defamatory must be viewed as a whole – including accompanying statements, headlines, pictures, and the general tenor and reputation of the source itself." *City of Keller v. Wilson*, 168 S.W.3d 802, 811 (Tex. 2005) (citing *New Times, Inc.*, 146 S.W.3d at 158-59; *Turner*, 38 S.W.3d at 114; *Guisti v. Galveston Tribune*, 105 Tex. 497, 150 S.W. 874, 877-78 (1912)).

Rehak's argument based on the website's asserted "false gist" invokes a related, context-based concept involving the manner in which particular words are presented. "Because a publication's meaning depends on its effect on an ordinary person's perception, courts have held that under Texas law a publication can convey a false and defamatory meaning by omitting or juxtaposing facts, even though all the story's individual statements considered in isolation were literally true or non-defamatory." *Turner*, 38 S.W.3d at 114 (citing *Golden Bear Dist. Sys. v. Chase Revel, Inc.*, 708 F.2d 944, 948-49 (5th Cir. 1983) (applying Texas law);

*Huckabee v Time Warner Entm't. Co.*, 19 S.W.3d 413, 525 (Tex. 2000); *Express Publ'g Co. v. Gonzalez*, 350 S.W.2d 589, 592 (Tex. Civ. App.—Eastland 1961, writ ref'd n.r.e.)). "[A] plaintiff can bring a claim for defamation when discrete facts, literally or substantially true, are published in such a way that they create a substantially false and defamatory impression by omitting material facts or juxtaposing facts in a misleading way." *Turner,* 38 S.W.3d at 115.

The analysis now applies these precepts to specific statements from Witt's "How to Succeed" website.

Rehak argues that the words "[r]ewarding," "ripping off," and "[b]ilking" as used in the context of Witt's "How to Succeed" campaign website have "specific meanings that include 'theft,' 'cheating,' 'swindling,' and 'defrauding.'" He contends: "The basis for those accusations cited by the Witts juxtaposed the history of RCS' Westchase District contracts with the history of Rehak's campaign contribution to Candidate Witt's primary opponent, misconstrued and misrepresented the contents of documents, and omitted key information concerning when her opponent first ran for office . . . ." He further contends that these words "accuse the Appellants of gaining influence over an elected official to obtain work, to steal and cheat taxpayers, and to help the elected official break the law." Thus, Rehak contends that these words are actionable as defamatory statements of fact.

Viewing the challenged statements as a whole and in context, we conclude that a person of ordinary intelligence would perceive these words as nothing more than rhetorical hyperbole. *See Am. Broad. Cos. v. Gill*, 6 S.W.3d 19, 30 (Tex. App.—San Antonio 1999, pet. denied) ("'Rhetorical hyperbole' is 'extravagant exaggeration' [that is] 'employed for rhetorical effect.'") (quoting Webster's Ninth

20

New Collegiate Dictionary 592, 1011 (1988 ed.)).[7]   A person of ordinary intelligence would not perceive these words to be defamatory statements of fact regarding Rehak or Rehak Creative Services, Inc.  *See Gill*, 6 S.W.3d 19 at 30 (statement by Resolution Trust Corporation investigator, who said that "[a]s a taxpayer" he "got screwed" by conduct resulting in losses absorbed by the federal government, constituted rhetorical hyperbole and was not a defamatory statement of fact as to former officers and directors of savings and loan association); *El Paso Times, Inc. v. Kerr*, 706 S.W.2d 797, 800 (Tex. App.—El Paso 1986, writ ref'd n.r.e.) (assertion that assistant United States attorney engaged in "cheating" during a criminal trial constituted rhetorical hyperbole and was not a defamatory statement of fact); *see also Church of Scientology of Cal. v. Cazares*, 638 F.2d 1272, 1288-89 (5th Cir. 1981) ("uncomplimentary" reference to Church of Scientology as a "rip-off, money motivated operation" was not defamatory under Florida law); *Raczkowski v. Peters*, No. 302606, 2012 WL 5853842, at *4 (Mich. Ct. App. Nov. 13, 2012) (per curiam) (unpublished) (terms "bilked" and "ripped off" used in television commercial criticizing political candidate were not defamatory under Michigan law; terms "amounted to 'rhetorical hyperbole' or a 'vigorous epithet'" and represented "'the language of the rough-and-tumble world of politics'") (citations omitted).

The website's tone and the campaign context of these statements reinforce our conclusion regarding the ordinarily intelligent person's perceptions, and the non-dullard's understanding that political advertising cannot necessarily be taken at face value.  This tone includes references to "that pesky Texas Constitution,"

---

[7] The Texas Supreme Court subsequently disapproved a separate portion of *Gill* addressing the viability of a "false gist" claim under Texas law.  *See Turner*, 38 S.W.3d at 115 (citing *Gill*, 6 S.W.3d at 43).  The disapproved portion of *Gill* has no bearing on the opinion's separate discussion of specific phrases that constituted rhetorical hyperbole.

and to Murphy as a "professional politician" and "bureaucrat." The website's analogy between an elected legislator and a character in a famous musical demonstrates an attempt to deliver a political message about the use of public money in an exaggerated, provocative and amusing way.

Regardless of whether the attempt actually succeeded, this type of communication lies "[a]t the heart of the First Amendment" and its "recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern." *Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 50 (1988). "The sort of robust political debate encouraged by the First Amendment is bound to produce speech that is critical about those who hold public office . . . ." *Id*. at 51. The First Amendment's protection for "statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual" provides "assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990) (citing *Hustler Magazine, Inc.* 485 U.S. at 50, 53-55); *see also Bentley v. Bunton*, 94 S.W.3d 561, 580 (Tex. 2002) (referencing constitutional protection of rhetorical hyperbole arising "in debate over public matters").

Rehak acknowledges the political context but stresses that the plaintiff here is **not** Jim Murphy, the elected public official running for re-election in 2012 who was targeted by a primary opponent. Rehak argues that this lawsuit is being pursued by a non-elected individual and his private company because Witt's campaign website accused them of "participating in an alleged scheme by her primary opponent to improperly control and profit from a state agency." In essence, Rehak complains that candidate Witt opened her rhetorical fire hose on Representative Murphy but indiscriminately hit Rehak with the spray.

22

Rehak's understandable chagrin at his presence on the "How to Succeed" website does not change our conclusion or diminish the importance of the political campaign context in which the challenged statements arose. The ordinary reader would understand that Witt's vigorous criticism targeted the incumbent elected official she hoped to unseat in the primary – not Rehak. *See Wheeler v. New Times, Inc.*, 49 S.W.3d 471, 474-75 (Tex. App.—Dallas 2001, no pet.).

The circumstances here parallel *Wheeler*, in which a landlord sued for libel contending that a newspaper article falsely portrayed him as a slumlord. The appellate court affirmed summary judgment in favor of the newspaper because the article was not reasonably capable of a defamatory meaning. *Id.* In so doing, the court stressed that "the article in this case does not expressly criticize Wheeler." *Id.* at 474. "Rather, the article is critical of Dallas's urban rehabilitation efforts." *Id.* at 475. "[W]e cannot conclude that a person of ordinary intelligence would perceive the article as implying that Wheeler manipulated or exploited the [Urban Rehabilitation Standards Board] . . . for his own benefit." *Id.* "Rather, we conclude the article suggests that it is the URSB and the City of Dallas, *not Wheeler*, who are ultimately responsible for the alleged improprieties that are the focus of the article." *Id.* (original emphasis). *Wheeler*'s conclusion applies with equal force to a campaign website that mentions a contributor in the course of a wide-ranging political attack on its main target – the opposing candidate pictured prominently at the top of the website, whose "run" it is "time to end."

Rehak's invocation of a "false gist" theory likewise fails to change the outcome here. Rehak acknowledges that some statements on the website are true. Rehak Creative Services, Inc. received and was paid for work it performed for the Westchase District starting in 2003. Murphy signed some of the documentation relating to this work. Rehak contributed to Murphy's campaigns. He contends that

23

material facts nonetheless were omitted because ". . . Rehak and Murphy had not known each other before RCS bid for work with the Westchase District in 2003; RCS received the work from the Westchase District as a result of winning the competitive proposal process; Murphy did not assign or supervise RCS's work for the Westchase District . . . ." He emphasizes that "Murphy did not run for the office in question, and Rehak did not contribute to his campaign, until 2005 – two years after RCS[] had won approval to do work for the Westchase District."

Rehak's "false gist" argument focuses on linked documents that were accessible on the "How to Succeed" website. Rehak contends: "To continue to make their misrepresentation . . . the Witts had to ignore the material true facts contained in those documents, and juxtaposed others, while continuing to include the references to Rehak and RCS under 'Step 6' of the core website." Rehak contends that documents linked to the "How to Succeed" website established the following facts.

- Rehak Creative Services, Inc. obtained contracts #1, #2, and #3 in 2003, before Rehak made his first campaign contribution to Murphy in 2005.

- Rehak reported to Westchase District employee Sherry Fox rather than Murphy.

- Contract #4 was approved by Westchase District employee Dave Gilkeson, not Murphy, after Murphy was elected.

- Rehak Creative Services, Inc. worked at market or below-market rates for Westchase District.

According to Rehak, these facts demonstrate the website's "false gist" arising from its suggestion that "Rehak obtained influence over Murphy with campaign contributions and, then, RCS received work from Murphy through the Westchase

24

District."

Rehak's "false gist" argument founders for two related reasons.

First, the linked documents are part of the context that must be taken into consideration when assessing what the website actually conveyed about Rehak. *See Kaufman*, 291 S.W.3d at 146; *see also Nicosia v. De Rooy*, 72 F. Supp. 2d 1093, 1103 (N.D. Cal. 1991); *Sandals Resorts Int'l, Ltd. v. Google, Inc.*, 925 N.Y.S.2d 407, 416 (N.Y. 2011); *Franklin v. Dynamic Details, Inc.*, 10 Cal. Rptr. 3d 429, 438-39 (Cal. Ct. App. 2004). Website access to linked documents distinguishes this case from *Bentley*, in which the host of a public access cable television program referenced documents that supposedly supported allegations of corrupt conduct by a local judge but did not make those documents accessible. *See Bentley*, 94 S.W.3d at 584 ("Bunton repeatedly insisted that evidence he had seen but had not disclosed supported his assertions. He had reviewed many public records, he said, and talked with courthouse employees."). Rehak argues that here, as in *Bentley*, "the Witts asserted that they had obtained factual information that corroborated their allegations in the Defamatory Post concerning Rehak and RCS, but the actual information they obtained and posted clearly did not support their accusation . . . ." In contrast to *Bentley*, this case does not involve "an implication of undisclosed facts." *Id.* Rather, the disclosed facts are part of the context we must consider in addressing how a person of ordinary intelligence would perceive the website's message.

Second, the context created by these linked documents confirms that a person of ordinary intelligence would perceive the website's statements to be politically flavored hyperbole rather than defamatory assertions of fact. If, as Rehak contends, the supporting linked documents unmistakably show "the exact opposite" of the gist he perceives in the website's text, then the person of ordinary

25

intelligence could be expected to pick up on this clue and conclude that rhetorical hyperbole is being employed as part of a political campaign during a contested primary.

Because this record does not contain a minimum quantum of clear and specific evidence demonstrating that the Witt campaign's "How to Succeed" website made defamatory statements of fact about Rehak and Rehak Creative Services, Inc., dismissal of the libel and business disparagement claims was appropriate under section 27.005(c).

## B.    Remaining Claims

### 1.    Tortious interference, emotional distress, and conspiracy

Rehak does not separately discuss the elements of his claims for tortious interference, intentional infliction of emotional distress, or conspiracy. He identifies no evidence – clear and specific or otherwise – addressing these elements.

Additionally, Rehak states as follows in his opening brief: "The underlying tortious activity that gives rise to each of the Plaintiffs' causes of action is defamation – and more specifically libel." Because the underlying activity at issue in this case is not tortious given the absence of defamatory statements of fact about Rehak, the tag-along tort claims predicated on the same website content also fail. "The same protections which the First Amendment affords defendants from libel claims also protect them from non-libel claims" based on the same publication. *Provencio v. Paradigm Media, Inc.*, 44 S.W.3d 677, 682-83 (Tex. App.—El Paso 2001, no pet.). The scope of free speech protection "do[es] not depend on the legal theory asserted by an inventive plaintiff." *Wavell v. Caller-Times Pub. Co.*, 809 S.W.2d 633, 635 (Tex. App.—Corpus Christi 1991, writ denied), *abrogated on*

26

*other grounds by Cain v. Hearst Corp.*, 878 S.W.2d 577 (Tex. 1994); *see also MKC Energy Invs. v. Sheldon*, 182 S.W.3d 372, 378 (Tex. App.—Beaumont 2005, no pet.); *KTRK Television v Felder*, 950 S.W.2d 100, 107-08 (Tex. App.—Houston [14th Dist.] 1997, no pet.).

For these reasons, dismissal under section 27.005(c) was proper with respect to Rehak's claims for tortious interference with business relationships and prospective business opportunities, intentional infliction of emotional distress, and civil conspiracy.

### 2. Conversion and misappropriation

Rehak contends that the burden never shifted to him to make a prima facie case under section 27.005(c) because Witt did not satisfy section 27.005(b)'s threshold requirement to show by a preponderance of the evidence that these two claims are based on, relate to, or asserted in response to Witt's exercise of the right of free speech.

Rehak argues: "The conversion and misappropriation claims do not arise from the libelous nature of the statements made on the Defamatory Post, but from a link on that post to a copyrighted page on RCS' website . . . that contains the logos of all of RCS' customers, many of which are registered trademarks that were used by the Witts without permission." He continues: "Other than the Westchase District, none of the other customers whose trademarks were shown on the linked page were implicated in the Witts' accusations. Therefore, there was no 'public concern' . . . served or implicated by linking those trademarks to the Defamatory Post."

We reject this contention because section 27.005(b)'s inquiry does not focus on whether the conversion and misappropriation claims arise from the assertedly

27

libelous nature of the website's statements. The correct analysis focuses on Chapter 27's unambiguous words. The statute broadly encompasses a "cause of action" that "relates to" the movant's "exercise of . . . the right of free speech." Tex. Civ. Prac. & Rem. Code Ann. §§ 27.001(6), 27.005(b)(1). The "[e]xercise of the right of free speech" encompasses "a communication made in connection with a matter of public concern," which includes "an issue related to . . . the government . . . [or] a public official . . . ." *Id.* § 27.001(3), (7)(C), (D). "In ordinary use, 'relates to' means to have a connection with, to refer to, or to concern." *Tex. Dept. of Pub. Safety v. Abbott*, 310 S.W.3d 670, 674-75 (Tex. App.—Austin 2010, no pet.).

On this record, we have no difficulty in concluding that section 27.005(b)'s initial burden is satisfied because Rehak's causes of action for conversion and misappropriation have a connection with a "communication" in the form of a political campaign website that "relates to" the Texas Legislature and an elected member of that body. Rehak therefore bore the burden to satisfy section 27.005(c)'s requirement of establishing "by clear and specific evidence a prima facie case for each essential element" of his claims for conversion and misappropriation.

Rehak cannot satisfy this burden with respect to conversion because intangible property cannot be converted unless the underlying intangible right has been merged into a document that has been converted. *Express One Int'l, v. Steinbeck*, 53 S.W.3d 895, 901 (Tex. App.—Dallas 2001, no pet.); *see also Real Estate Innovations, Inc. v. Houston Ass'n of Realtors, Inc.*, 422 F. App'x 344, 350 (5th Cir. 2011), *cert. denied*, 132 S. Ct. 249 (2011). He likewise cannot satisfy this burden with respect to damages in connection with his claim for misappropriation. Rehak contends on appeal that "RCS lost a lucrative business project after one of

28

its clients complained about the misuse of its logo by the Witts." In his affidavit, Rehak states: "Recently, Halliburton chose another agency to handle a project that RCS would normally have handled. The lost fee was $100,000." This conclusory assertion does not rise to the level of "clear and specific" evidence sufficient to make out a prima facie case of damages caused by and attributable to the alleged misappropriation.

## CONCLUSION

We overrule Rehak's issues and affirm the trial court's judgment.


/s/     William J. Boyce
        Justice


Panel consists of Chief Justice Hedges and Justices Boyce and Donovan.