**TEXAS CAMPAIGN FOR THE ENVIRONMENT and Robin Schneider, Appellants,**

v.

**PARTNERS DEWATERING INTERNATIONAL, LLC, Appellee.**

**NUMBER 13–14–00656–CV**

Court of Appeals of Texas, Corpus Christi–Edinburg.

Delivered and filed January 21, 2016

---

Sara M. Berkeley Churchin, Thompson, Coe, Cousins & Irons, LLP, Austin, TX, for Appellants.

Keith W. Lapeze, The Lapeza Firm, P.C., Houston, TX, for Appellee.

Before Chief Justice Valdez and Justices Rodriguez and Longoria

## OPINION

Opinion by Justice Rodriguez

This is an interlocutory appeal from the denial of the motion to dismiss filed pursuant to the Texas Citizens Participation Act (TCPA or the Act), also known as an Anti-SLAPP statute.[1] *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 27.001–.011 (West, Westlaw through 2015 R.S.). By two issues, appellants the Texas Campaign for the Environment (TCE)[2] and Robin Schneider, the TCE's Executive Director, contend that the trial court erred in denying their motion to dismiss because the non-movant appellee Partners Dewatering International, LLC (PDI) failed to establish a prima facie case by clear and specific evidence for each essential element of (1) its tortious interference claim, and (2) its business disparagement claim. We affirm in part and reverse and remand in part.

### I. BACKGROUND

PDI, a grease and grit trap processing business, filed suit against Schneider and the TCE, an Austin-based 501(c)(4) non-profit organization that is involved in organizing and lobbying for various environmental concerns. *See* 26 U.S.C.A. § 501(c)(4).[3] PDI alleged tortious inter-

1. "SLAPP" is an acronym for "Strategic Lawsuits Against Public Participation." *See In re Estate of Check*, 438 S.W.3d 829, 830 n. 1 (Tex.App.—San Antonio 2014, no pet.). This Anti–SLAPP statute permits defendants targeted by SLAPP suits to move for dismissal if the action relates to the defendant's exercise of the right of free speech, right to petition, or right of association. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.003 (West, Westlaw through 2015 R.S.); *see also Kinney v. BCG Attorney Search, Inc.*, No. 03–12–00579–CV, 2014 WL 1432012, at *1 (Tex.App.—Austin Apr. 11, 2014, pet. denied) (mem. op. on reh'g).

2. The evidence in this case also refers to the Texas Commission on Environmental Quality (TCEQ), which is not a party in this lawsuit. Among other things, "the TCEQ has the primary authority to establish surface water quality standards, which it implements, in part, in its permitting actions." *Tex. Com'n on Envtl. Quality v. City of Waco*, 413 S.W.3d 409, 411 (Tex.2013); *see* 33 U.S.C. § 1313(a), (d); Tex. Water Code Ann. § 26.023 (West, Westlaw through 2015 R.S.); *see also* Tex. Water Code Ann. § 5.013(a)(3) (granting the TCEQ general jurisdiction over "the state's water quality program including issuance of permits, enforcement of water quality rules, standards, orders, and permits, and water quality planning")).

3. PDI also sued SOS Liquid Environmental Solutions of Texas, LLC (SOS), a company in the business of grease and grit trap pumping, transporting, and processing. Jess Mayfield, who is Carter Mayfield's father and PDI's majority owner, also owned SOS. On September 10, 2014, the trial court signed an order

ference with an existing contract between PDI and the City of Rio Hondo (Rio Hondo) and business disparagement.

It is undisputed that on November 1, 2008, PDI entered into the contract at issue—an operating lease agreement with Rio Hondo for a liquid waste dewatering facility with Rio Hondo. This contract was similar to an existing contract that PDI had entered into with the City of LaCoste (LaCoste) in 2000.[4] Under its terms, the Rio Hondo contract continued for ten years to October 31, 2018, with an initial five-year term, which would be extended for an additional five years if PDI was not in "material default of this Agreement." According to the contract, a material default occurred if "three (3) times after having been given notice of a breach, it remains uncorrected for three (3) days. In the event of such a breach [Rio Hondo] may terminate this Agreement." And if Rio Hondo ceased to operate the dewatering system for its intended purpose, the agreement "shall automatically terminate." The contract provided that PDI would apply for the proper permits and registrations to establish, operate, and maintain a liquid waste dewatering facility located within Rio Hondo's already-established water treatment plant. Paragraph 7 of the contract set out that PDI "shall at no time receive, create or store any hazardous or toxic waste in the operation or maintenance of the Facility in the Plant."

It is undisputed that from 2010 through 2012, the TCE was involved in a campaign to terminate the 2000 contract that PDI had with LaCoste; the campaign was unsuccessful. In September 2012, Schneider received public notice from the Texas Commission of Environmental Qualify (TCEQ) that PDI had plans to obtain a registration from the TCEQ to take commercial loads of waste to the Rio Hondo wastewater treatment plant, as it did in LaCoste. The TCE included Rio Hondo in its canvassing in the Rio Grande Valley.[5] In its amended petition, PDI set out the following allegedly false statements that the TCE's employees and representatives told the residents of Rio Hondo and contrasted these statements with what PDI asserted was the truth:

a. PDI had an "unsatisfactory" compliance record with [the TCE] for the LaCoste facility. The truth, however, is that [the TCE] has given PDI a high compliance rating for the LaCoste facility. This information was readily available to the public on [the TCE]'s website.

b. PDI was processing 1 million gallons per month in [Rio Hondo]'s wastewater system, but would only pay $1,500 per month, which was less than half the sewer rate the residents of Rio Hondo were paying. The truth was that PDI's contract with [Rio Hondo] provided a minimum payment of $1,500 per month, and $.01 per gallon. Therefore, if PDI processed 1 million gallons, it would pay [Rio Hondo] $10,000 per month, which is more than six times

nonsuiting, without prejudice, PDI's claims against SOS.

4. The record shows that under the terms of the LaCoste contract, PDI would accept grease trap waste, grit trap waste, and septage at a dewatering unit located at the LaCoste wastewater treatment plant in exchange for a fee for every gallon collected.

5. TCE contends that it had already planned the trip to Rio Hondo before it received notice of PDI's planned registration with the TCEQ. We note, however, that at the time TCE planned the trip only the LaCoste facility was at issue.

what the residents of [Rio Hondo] paid.

c. PDI was going to accept "toxic industrial waste" at the Rio Hondo facility. The truth was that PDI was going to accept only nonhazardous waste.

d. The City of LaCoste residents had to boil their water to avoid getting sick after a discharge from [LaCoste]'s wastewater plant. [The truth was that] . . . LaCoste's wastewater plant had absolutely nothing to do with [LaCoste]'s drinking water system.

According to PDI's petition, the TCE asked citizens to write letters to the TCEQ and other city and state officials expressing their concerns about PDI. The TCE acknowledges, on appeal, that the efforts of its organizers generated thirty-six letters to the Mayor, City Commissioners, area state legislators, and the TCEQ. In addition, two state representatives requested a public meeting for discussion of the new waste facility. PDI claimed in its petition that "prior to the TCE coming into Rio Hondo, there was no public opposition and City officials had no concerns over PDI's contract with the City or its plans to operate the dewatering facility at the City's wastewater treatment plant."

After a public meeting on January 13, 2013, the City Council met privately with PDI. According to an affidavit PDI filed in response to the TCE's motion to dismiss, Carter Mayfield, the Director of Finance and financial analyst for PDI, averred that after the January 13 meeting City Council member Gerald Hertzog "said that he felt like the deal had gone 'sour.' And that we should just walk away. . . . He said that it

didn't matter [if PDI's leaving would be the best thing for Rio Hondo] at this point, that the 'environmental group' had people all wound up over this." PDI set out in its petition that on January 14, 2013, the Brownsville Herald quoted Schneider as saying that PDI had an "unsatisfactory" compliance record with the TCE. According to PDI, Schneider said that PDI did not comply with the laws of Texas and accused PDI of taking advantage of small cities and breaking the law. PDI claimed that these statements were false.

It is undisputed that the TCEQ held its public meeting in Rio Hondo on January 17, 2013. Andrew Dobbs, and others, represented the TCE at the meeting. On February 17, 2013, Rio Hondo held a City Council meeting where the decision was made to "cancel" the contract between Rio Hondo and PDI.

PDI alleged in its petition that on February 18, 2013, the TCE took credit for Rio Hondo cancelling the contract when it admitted that its activities caused the cancellation of the contract—calling it a "victory." On February 28, 2013, Rio Hondo sent a letter to the TCEQ informing it of the cancellation of PDI's contract.

PDI filed suit against the TCE, alleging tortious interference with an existing contract—PDI's contract with Rio Hondo—and business disparagement. PDI sought actual damages, pre- and post-judgment interest, court costs, and exemplary damages. PDI alleged that it "suffered significant special damages in excess of $6.5 million." The TCE and Schneider answered, generally denying all allegations and pleading numerous defenses.[6]

---

6. The TCE and Schneider pleaded the following defenses: (1) truth and/or substantial truth; (2) qualified privilege; (3) absolute privilege; (4) failure to state a claim; (5) justification; (6) privilege; (7) comparative responsibility; (8) failure to mitigate; (9) damage caps; and (10) a constitutional bar on punitive or exemplary damages.

The TCE and Schneider filed a motion to dismiss, arguing that the TCPA protected its actions. They argued that the lawsuit is based on, relates to, or is in response to the TCE's exercise of the right to free speech, right to petition, or right to association.[7] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(b). PDI responded to TEC's motion.[8] It did not dispute that the TCE and Schneider met their burden to show, by a preponderance of the evidence, that the lawsuit was based on or related to the exercise of those constitutional rights. *See id.* Instead, PDI argued that it met its burden to avoid dismissal under the TCPA by establishing "by clear and specific evidence a prima facie case for each essential element" of its claims. *See id.* § 27.005(c).

PDI also filed a motion to strike portions of Schneider's affidavit.[9] The TCE filed a reply to this motion and made numerous objections to PDI's evidence, some of which were sustained by the trial court in open court at a hearing on September 17, 2014, or resulted in the agreed withdrawal of all or portions of PDI's evidence.[10] The TCE also replied in support

7. In support of its motion to dismiss, the TCE attached the affidavits of Schneider and Stacy Guidrey, the Central Texas Program Director for TCE. It also attached PDI's responses to the TCE's requests for disclosure; a December 28, 2004 letter from the Director of Inland Fisheries with the Texas Parks and Wildlife Department (TPWD) to the City Administrator of LaCoste regarding a September 24, 2004 unauthorized release of untreated sewage from the LaCoste wastewater treatment plant and requesting a civil penalty be paid by LaCoste to the TPWD; an August 4, 2010 letter from the TCEQ to LaCoste's City Administrator regarding five investigations between May 3, 2010 and June 29, 2010 of the LaCoste Wastewater Treatment Plant, potential penalties, and corrective actions, the satisfaction of which may lessen the administrative penalty; and a posting by the Valley Morning Star on February 17, 2013 titled "SEWER PLAN NIXED: Rio Hondo terminates grease contract."

8. In support of its response, PDI filed the following: (1) the affidavit of Taylor L. Shipman, an attorney for PDI in this matter, identifying and attaching relevant documents that she found or requested as part of her work on this case including pages from the TCE website, a February 18, 2013 TCE Facebook post, a May 16, 2013 Open Records Request to the TCEQ and a June 4, 2013 request to Rio Hondo, November 10, 2012 minutes from a Rio Hondo City Council Meeting, PDI's Compliance History, and a page from the TCE website entitled Texas Campaign for the Environment: Victories 2013; (2) the TCEQ Certified Documents; (4) the affidavit of Carter Mayfield, PDI's Director of Finance and financial analyst, attaching the executed contract between PDI and Rio Hondo, a presentation given by Carter and hosted by PDI at an November 10, 2012 informational meeting in Rio Hondo, a PDI high compliance rating from the TECQ website, handouts and fliers passed out by the TCE, a detailed financial model, and a breakdown of costs expended by PDI before Rio Hondo cancelled the contract; (5) news articles dated August 12, 2010, January 7, 2013, January 14, 2013, and February 17, 2013; (6) audio transcripts of TECQ's hearings regarding the application of PDI competitor Micro Dirt, Inc. d/b/a Texas Organic Recovery; (7) Rio Hondo's application for its registration of the Type V Liquid Waste Processing Facility; (8) the transcript of the TCEQ's January 17, 2013 public meeting; (9) the affidavit of Jess Mayfield, discussing his involvement in the LaCoste Waste Water Treatment Plant as President and Manager of SOS Enviro Services, LLC, with boil water notice documents attached; and (10) the affidavit of George Salzman, LaCoste's City Manager during the relevant time period, explaining the boil alert.

9. The record contains no order granting or denying PDI's motion to strike portions of Schneider's affidavit. So we review the affidavit in its entirety.

10. Although the trial court made several open-court rulings on the parties' objections at the September 17 hearing, it did not sign an agreed proposed order, submitted on September 25, 2014, that pertained to the parties' remaining objections. Because no other written order on the TCE's objections to PDI's

of its motion to dismiss, reasserting arguments made in its motion, claiming that PDI did not establish certain elements of its claims by clear and specific evidence, and requesting attorney's fees.[11] The motion to dismiss was overruled by operation of law on October 24, 2014, thirty days after the hearing on the motion concluded. *See id.* §§ 27.005(a), 27.008(a). This interlocutory appeal followed.

## II. APPLICABLE LAW

The purpose of the TCPA is "to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." *Id.* § 27.002. The TCPA is to "be construed liberally to effectuate its purpose and intent fully," but it "does not abrogate or lessen any other defense, remedy, immunity, or privilege available under other constitutional, statutory, case, or common law or rule provisions." *Id.* § 27.011.

The TCPA provides a procedure for the expedited dismissal of "retaliatory lawsuits that seek to intimidate or silence [citizens] on matters of public concern." *In re Lipsky,* 460 S.W.3d 579, 584 (Tex.2015) (orig.proceeding). The Act provides,

> [a] two-step process is initiated by motion of a defendant who believes that the lawsuit responds to the defendant's valid exercise of First Amendment rights.

Under the first step, the burden is initially on the defendant-movant to show "by a preponderance of the evidence" that the plaintiff's claim "is based on, relates to, or is in response to the [movant's] exercise of: (1) the right of free speech; (2) the right to petition; or (3) the right of association." TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(b). If the movant is able to demonstrate that the plaintiff's claim implicates one of these rights, the second step shifts the burden to the plaintiff to "establish[ ] by clear and specific evidence a prima facie case for each essential element of the claim in question." *Id.* § 27.005(c).

*In re Lipsky,* 460 S.W.3d at 584. And even if the nonmovant makes this showing, the trial court must dismiss the case if the movant "establishes by a preponderance of the evidence each essential element of a valid defense to the nonmovant's claim." TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(d). When determining whether to dismiss the legal action, the court must consider "the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based."[12] *Id.* § 27.006(a).

 "[A prima facie case, in its traditional legal meaning] refers to evidence sufficient as a matter of law to establish a given fact if it is not rebutted or contradicted." *In re Lipsky,* 460 S.W.3d at 590. A prima facie standard generally requires only the "minimum quantum of evidence

---

evidence appears in the record, we review all of PDI's evidence except for those portions excluded by the trial court on September 17 or withdrawn by agreement.

11. The TCE and Schneider supported their request for attorneys' fees with the affidavit of Stephen A. Wood who was its counsel of record. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.009(a) (West, Westlaw through 2015 R.S.).

12. A "pleading" is "a document containing the written allegations of fact that each party is required to communicate to the opponent before trial, so that each will know what contentions must be met by the evidence." Bryan Garner, A DICTIONARY OF MODERN LEGAL USAGE 667 (2nd ed,1995). "Examples of pleadings are complaints, petitions, counterclaims, and answers." *Id.*

necessary to support a rational inference that the allegation of fact is true." *Id.* (quoting *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 223 (Tex.2004) (orig.proceeding) (per curiam)). "Prima facie evidence is evidence that, until its effect is overcome by other evidence, will suffice as proof of a fact in issue. In other words, a prima facie case is one that will entitle a party to recover if no evidence to the contrary is offered by the opposite party." *Rehak Creative Servs., Inc. v. Witt*, 404 S.W.3d 716, 726 (Tex.App.—Houston [14th Dist.] 2013, pet. denied) (citation omitted), *disapproved on other grounds* by *In re Lipsky*, 460 S.W.3d at 587–88); *cf. Kerlin v. Arias*, 274 S.W.3d 666, 668 (Tex.2008) (per curiam) (explaining that summary-judgment movant's presentation of prima facie evidence of deed's validity established his right to summary judgment unless nonmovants presented evidence raising a fact issue related to validity).

"The Act does not define 'clear and specific' evidence; consequently, we give these terms their ordinary meaning." *Serafine v. Blunt*, 466 S.W.3d 352, 358 (Tex.App.—Austin 2015, no pet.) (op. on reh'g) (citing *TGS–NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex.2011)). "'Clear' means 'free from doubt,' 'sure,' or 'unambiguous.'" *Id.* (quoting BLACK'S LAW DICTIONARY 307 (10th ed.2014)); *see In re Lipsky*, 460 S.W.3d at 590 (approving this definition of "clear"). And "'[s]pecific' means 'explicit' or 'relating to a particular named thing.'" *Id.* (quoting BLACK'S LAW DICTIONARY at 1616); *see In re Lipsky*, 460 S.W.3d at 590 (approving this definition of "specific").

In *In re Lipsky*, the supreme court explained that the phrase "clear and specific evidence" neither imposes a heightened evidentiary burden nor categorically rejects the use of circumstantial evidence when determining the plaintiff's prima-facie-case burden under the TCPA. 460 S.W.3d at 591. "[A] plaintiff must provide enough detail to show the factual basis for its claim." *Id.*; *see D MagazinePartners, L.P. v. Rosenthal*, 475 S.W.3d 470, 480 (Tex.App.—Dallas 2015, pet. filed).

■ "Conclusory statements are not probative and accordingly will not suffice to establish a prima facie case." *Serafine*, 466 S.W.3d at 358 (citing *Better Bus. Bureau of Metro. Houston, Inc. v. John Moore Servs., Inc.*, 441 S.W.3d 345, 355 (Tex.App.—Houston [1st Dist.] 2013, pet. denied) (citing *In re E.I. DuPont*, 136 S.W.3d at 223–34)). In other words, "bare, baseless opinions" are not "a sufficient substitute for the clear and specific evidence required to establish a prima facie case" under the Act. *In re Lipsky*, 460 S.W.3d at 592. "Opinions must be based on demonstrable facts and a reasoned basis." *Id.* at 593. (citing *Elizondo v. Krist*, 415 S.W.3d 259, 265 (Tex.2013)).

## III. Standard of Review

■ "We consider de novo the legal question of whether the movant has established by a preponderance of the evidence that the challenged legal action is covered under the Act." *Serafine*, 466 S.W.3d at 357 (citing *Rehak Creative Servs.*, 404 S.W.3d at 725). "We also review de novo a trial court's determination of whether a nonmovant has presented clear and specific evidence establishing a prima facie case for each essential element of the challenged claims." *Id.* (citing *Rehak Creative Servs.*, 404 S.W.3d at 726).

## IV. Prima Facie Case by Clear and Specific evidence— PDI's Burden

It is undisputed that PDI's action "is based on, relates to, or is in response to" appellants' exercise of the right to free

speech, right to petition, or right to association. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.005(b). So only the second step of our review is at issue—the question of whether PDI has met its burden of "establish[ing] by clear and specific evidence a prima facie case for each essential element of the claim in question." *Id.* § 27.005(c). By two issues, appellants contend that PDI has not met this burden for either its claim for tortious interference with contract or its claim for business disparagement. Appellants assert that because PDI did not produce clear and specific evidence of its claims, it cannot avoid dismissal under the Act.

### A. PDI's Tortious Interference Claim

By their first issue, appellants contend that the trial court should have granted their motion and dismissed PDI's tortious interference claim because PDI did not meet its burden under the TCPA. We disagree.

#### 1. Elements

■ To prevail on a claim of tortious interference with an existing business contract, a plaintiff must establish that (1) it had a valid contract; (2) the defendant willfully and intentionally interfered with the contract; (3) the interference proximately caused the plaintiff's injury; and (4) the plaintiff incurred actual damage or loss. *See Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 207 (Tex.2002) (op. on reh'g); *Holloway v. Skinner,* 898 S.W.2d 793, 795–96 (Tex.1995). Appellants challenge the second, third, and fourth elements of PDI's claim of tortious interference with an existing business contract.[13]

#### 2. Discussion

### a. Interference

■ In a claim for tortious interference with an existing contract, once the existence of a contract is established, we must consider whether or not there was any interference with that contract. *Holloway,* 898 S.W.2d at 794–95; *see also C.A. Rasmussen, Inc. v. Linck,* No. 13–98–509–CV, 2000 WL 35722015, at *2 (Tex.App.—Corpus Christi Mar. 23, 2000, no pet.) (mem.op.). Interference with a contract is tortious only if it is intentional. *Sw. Bell Tel. Co. v. John Carlo Tex., Inc.,* 843 S.W.2d 470, 472 (Tex.1992). There must be direct evidence of a willful act of interference. *Browning–Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 927 (Tex.1993). The interfering party must know of the existence of a contract between the plaintiff and a third party or have knowledge of facts that would lead a reasonable person to conclude that a contract existed. *Exxon v. Allsup,* 808 S.W.2d 648, 656 (Tex.App.—Corpus Christi 1991, writ denied).

First, appellants argue that Rio Hondo enjoyed statutory immunity from liability when it terminated the contract because the contract was not for "goods and services." Appellants argue that it is not actionable interference if Rio Hondo was induced to do something it had the right to do. *See* Tex. Loc. Gov't Code Ann. §§ 271.151(2), 271.152 (West, Westlaw through 2015 R.S.) (providing for a waiver of governmental immunity from suit in the context of a claim of breach of a contract to provide "goods or services" to a local governmental entity); *Kirby Lake Dev., Ltd. v. Clear Lake City Water Auth.,* 320 S.W.3d 829, 838–39 (Tex.2010). From this premise, appellants reason that as a mat-

---

13. Appellants do not dispute that PDI has introduced clear and specific evidence of a valid contract between PDI and Rio Hondo for a dewatering plant, satisfying the first element of its tortious interference claim. *See Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 207 (Tex.2002). We agree that PDI met its burden on this element. *See id.*

ter of law, their "alleged interference is not actionable and does not constitute any, let alone 'clear and specific' evidence that [appellants are] liable for tortious interference." The focus of this argument is whether, as a matter of law, the contract is subject to appellants' alleged interference. *See ACS Invs., Inc. v. McLaughlin,* 943 S.W.2d 426, 431 (Tex.1997).

Appellants base their argument on the assumption that the contract in this case did not involve "goods or services." However, when Rio Hondo terminated the contract, PDI sued Rio Hondo for breach of contract. *See Partners Dewatering Int'l, L.C. v. City of Rio Hondo,* No. 13–13–00340–CV, 2015 WL 3637853, at *1 (Tex. App.—Corpus Christi July 14, 2015, pet. filed) (mem.op.). Rio Hondo filed its plea to the jurisdiction, claiming it was immune from suit. *Id.* The trial court granted Rio Hondo's plea. *Id.* PDI filed an accelerated appeal from that ruling. *Id.* at *8. Upon review, this Court concluded that Rio Hondo waived immunity because the contract contemplated, in part, "the provision of [a] service to Rio Hondo [by PDI] under the statute." *Id.* We reversed and remanded the case to the trial court. *Id.* Based on our interpretation of the contract, Rio Hondo did not have immunity. So the TCE could have interfered, and its interference is arguably actionable. So appellants' legal argument fails.[14]

■ Moreover, PDI's evidentiary support included Shipman's affidavit with the following attachments: (1) a posting from the TCE's website titled "Take Action Rio Hondo! Keep Industrial Liquid Waste Out of Rio Hondo's Treatment Plant," (a) that discussed PDI's proposed liquid waste facilities in Rio Hondo, PDI's allegedly problematic facility in LaCoste, public meetings, and the need for public support for keeping industrial liquid waste out of Rio Hondo's treatment plant through a letter-writing campaign, and (b) that contained links to news broadcasts and media stories regarding PDI's operations in LaCoste and its proposed facility in Rio Hondo, a link to PDI's application for the proposed plant, and links to two separate sample letters regarding the Rio Hondo site with "tips for letter writing"[15]; (2) a TCE February 18, 2013 post discussing "Victory in Rio Hondo!"[16]; and (3) a page

---

14. On August 28, 2015, Rio Hondo filed a petition for review in the Texas Supreme Court. *See Partners Dewatering Int'l, L.C. v. City of Rio Hondo,* No. 13–13–00340–CV, 2015 WL 3637853, at *1 (Tex.App.—Corpus Christi July 14, 2015, pet. filed) (mem.op.). Among other issues, Rio Hondo contended that we "misapplied the burden of proof in a waiver of immunity analysis, relying on evidence not in the appellate record to erroneously conclude that PDI provided a service to the City." The parties have briefed the issues; however, the supreme court has not yet resolved Rio Hondo's appeal. Because our prior opinions have continuing authority even when a party contends that a precedent was incorrectly decided, we have an obligation to follow our own precedent until which time the supreme court provides us guidance on this matter. *See Grimes County Bail Bond Bd. v. Ellen,* 267 S.W.3d 310, 315 (Tex.App.—Houston [14th Dist.] 2008, pet. denied).

15. We note that the page included the following additional suggestions for those who were "writing at the request of a canvasser": (1) "leave porch light on and leave [the letters] on your door by 8:00pm [sic] tonight"; (2) "put your letters in an addressed, stamped envelope"; and (3) "leave your letters unsealed if you don't mind."

16. The TCE post, which included a picture of the city commissioners, read, "Victory in Rio Hondo! After six months of organizing and activism, the Rio Hondo city commission decided unanimously to back out of their contract with a problem liquid waste processor. Thank you to all the local activists and concerned citizens who stood up and made this victory possible!"

from the TCE's website titled "Texas Campaign for the Environment: Victories 2013" that summarized four victories, one of which was the cancellation of PDI's contract for a liquid waste facility in Rio Hondo.[17]

PDI also relied on Mayfield's affidavit that set out, among other things, the following:

1. In September 2012, Alonzo Garza, the mayor of Rio Hondo, called Mayfield and told him that the City Council asked for a "refresher on the PDI/Rio Hondo contract." On the way to Rio Hondo for that discussion, "we received phone calls from the local media about our proposed facility in Rio Hondo. The TCE had been making negative statements about our company." The commissioners had a few questions about the time line for getting the TCEQ approval, but they were still "upbeat";

2. In October, Garza and others visited the LaCoste wastewater treatment plant to see what PDI does and how such a facility works and "said they were definitely interested in our continued relationship. [PDI] said that [it] had seen the TCE protest and that they can turn people against them. Mr. Garza and Mr. Uresti said that they could reason with the people and that the people of Rio Hondo would trust them over some 'environmentalists from Austin'";

3. PDI hosted an informational meeting in Rio Hondo on November 10, 2012. After the meeting, "[t]he mayor and

Mr. Uresti said they felt the meeting went well, but based on the questions, it seemed like some people had already hardened their views based on misinformation";

4. On January 13, 2013, the Rio Hondo City Council met "to determine what to do about the contract with PDI." In attendance were PDI, a large number of citizens from Rio Hondo and surrounding areas, and members of the TCE, Andrew Dobbs and Renee Vaughan. While the City Council went into a special closed session to review their options, "Dobbs took control and started talking about how no one wants PDI here and this was the chance for citizens to tell PDI how they felt about us.... PDI started to speak again about [its] process and [PDI] appeared to be making some roadway in helping people understand the process. Then Andrew Dobbs started shouting [PDI] down and said, 'I think we have heard enough. Let's leave.' and he started ushering the attendees out of the room." Later when the City Council reconvened in public, Gerald Hartzog "said that he felt like the deal had gone 'sour.' And that [PDI] should just walk away. [Mayfield] asked him if he truly felt that having [PDI] leave would be the best thing for the city. He said that it didn't matter at this point, that the 'environmental group' had people all wound up over this"; and

5. At the January 17, 2013 TCEQ public meeting, "Andrew Dobbs was handing

---

17. Described in this post were TCE's 2013 victories. The victory regarding the PDI/Rio Hondo contract read as follows:

A problem liquid waste company announced last year that they were going to be operating in the Rio Grande Valley community of Rio Hondo, and [the] TCE organizers swung into action. Letters to area lawmakers led to a public meeting in which more than 200 residents packed city hall in unanimous opposition to the plan. After intense public pressure[,] the Rio Hondo City Commission cancelled their contract with the company, ending the project and its threat to the sensitive Arroyo Colorado.

out instruction sheets for participation to the audience and continually told the audience to hold their comments until they could go on the record."

In addition, a post from the Valley Morning Star on January 14, 2013, attached to Mayfield's affidavit, informed the reader that the TCEQ refused to cancel a hearing on PDI's "proposal to use the city sewer plant to treat liquid restaurant and car wash waste" because "[r]esidents' input will help the agency determine whether it will grant the a[sic] permit to allow the company to begin the project...." The article also provided the following regarding the TEC's involvement:

Texas Campaign for the Environment, an Austin group, has rallied residents to oppose the project.

The environmental group has distributed fliers that accuse [PDI] of violations in its operation of a sewer plant it runs for the city of La[ ]Coste near San Antonio.

The company has an "unsatisfactory" compliance record, the group said.

"They don't comply with the laws of the state of Texas and that's why we're taking them on," Robin Schneider, the group's executive director, said.

. . . .

Schneider accused the company of "trying to buy off small (cities) to use wastewater treatment plants not designed to treat commercial waste."

"They take advantage of small cities and break the law and that's what they're trying to do in Rio Hondo," she said.

Finally, it is undisputed that on February 17, 2013, Rio Hondo decided to cancel the contract between Rio Hondo and PDI.

We conclude that the evidence regarding appellants' alleged intentional interference is clear and specific. It is unambiguous; easily understood. It is explicit and relates to appellants' actions regarding the contract between Rio Hondo and PDI. *See Serafine*, 466 S.W.3d at 358. In sum, PDI offered evidence that Schneider, who knew of the contract between PDI and Rio Hondo or who had knowledge of facts that would lead a reasonable person to conclude that a contract existed, received notice from the TCEQ that PDI planned to register to take waste to the Rio Hondo wastewater treatment plant. During September 2012, the TCE was canvassing in the Rio Grande Valley; the canvassing included Rio Hondo. The organizers of the canvass went door-to-door in downtown Rio Hondo and outlying neighborhoods near the plant. Posts on the TCE website explained that the organizers had informed residents of their right to request a public meeting and had asked residents to write letters to their state legislators to request a public meeting on PDI's pending TCEQ registration. Appellants also asked citizens to sign a "statement in support" and to write letters to the TCE and other city and state officials expressing their concerns about PDI. Appellants explained in the posts that "[w]e need our City Commissioners to take a stand for our air, water and community by getting out of this deal!" PDI offered evidence that representatives of the TCE appeared at public meetings, at times taking control of the meeting, talking about how no one wants PDI in Rio Hondo and instructing the public on how to participate effectively at the meetings. City council members believed that the "environmental group" had people "all wound up" over PDI's contract with Rio Hondo. PDI's evidence also sets out that appellants were involved in the campaign against PDI's Rio Hondo facility from at least 2012, after the TCE's unsuccessful 2010–2012 campaign against PDI's facility in LaCoste, through the termination of the PDI/Rio Hondo contract in early 2013.

. The evidence is sufficient as a matter of law to establish a given fact—intentional interference—if it is not rebutted or contradicted. *See In re Lipsky*, 460 S.W.3d at 590. It supports a rational inference that the allegation of appellants' intentional interference is true. *See id.* The evidence will suffice as proof of appellants' intentional interference and would entitle PDI to recover if appellants offer no evidence to the contrary. *See Rehak*, 404 S.W.3d at 726. Based on the evidence set out above, we conclude that PDI established "by clear and specific evidence a prima facie case" for the intentional interference element of its tortious interference claim. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.005(c).

### b. Proximate Causation

■ Addressing the third element of this claim, appellants contend that PDI has not presented any evidence that appellants' interference, if any, proximately caused Rio Hondo to terminate its contract with PDI. *See Butnaru*, 84 S.W.3d at 207. In a tortious interference claim, "[a] plaintiff must be able to show that the act of interference was the proximate cause of the damages suffered by it. This is the classic proximate cause test with the component elements of cause in fact and foreseeability." *Hill v. Heritage Res., Inc.*, 964 S.W.2d 89, 126 (Tex.App.—El Paso 1997, pet. denied); *see Richardson–Eagle, Inc. v. William M. Mercer, Inc.*, 213 S.W.3d 469, 474 (Tex.App.—Houston [1st Dist.] 2006, pet. denied) (op. on reh'g). Considering cause in fact, the defendants' acts or omissions must have been a "substantial factor" in bringing about the injury. *See Nixon v. Mr. Prop. Mgmt. Co,*

*Inc.*, 690 S.W.2d 546, 549 (Tex.1985); *Richardson–Eagle*, 213 S.W.3d at 474. "Foreseeability" means that the actor, as a person of ordinary intelligence, should have anticipated the dangers that his act created for others. *Portlock v. Perry*, 852 S.W.2d 578, 583 (Tex.App.—Dallas 1993, writ denied) (en banc). In other words, proximate cause is that cause, unbroken by any new and independent cause, that produces injury and without which the injury would not have occurred. *See id.; see also Hill*, 964 S.W.2d at 126 (noting that the classic proximate cause test applies to tortious interference cases).

■ Appellants contend that PDI did not satisfy its burden of presenting clear and specific evidence of proximate cause because it only presented evidence that is mere speculation. Relying on *Burbage v. Burbage*, appellants claim that the legal effect of this evidence is no evidence because it creates a mere surmise or suspicion of a vital fact. *See* 447 S.W.3d 249, 259 (Tex.2014) ("We regard evidence that creates a mere surmise or suspicion of a vital fact as, in legal effect, no evidence."); *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 246 (Tex.2008) ("Proximate cause cannot be satisfied by mere conjecture, guess, or speculation."). Appellants claim that "the best that [PDI] can do is reference online postings[,] including the post that discussed "[a] problem liquid waste company ... to be operating in ... Rio Hondo, and the TCE organizers swung into action" and the "Victory in Rio Hondo" post[,] purportedly made by [appellants]...."[18] Regarding the posts, appellants assert that while PDI

18. Appellants also claim that PDI relied on the following statement made by the Rio Hondo City Attorney in an article posted by the Valley Morning Star: "changes within the city's administration and the City Commission, as well as public pressure, led commissioners to reconsider the contract." We are not persuaded by this argument because we find nothing in the record where PDI relied on this statement. And, if it did, our analysis would also apply to that statement and post.

has attempted to characterize these purported online statements as judicial admissions, the posts are only "two general statements by an environmental organization characterizing as a 'victory' the termination of a contract that would have permitted the dumping of wastewater into a river constitute no evidence, and certainly not clear and specific evidence, that the organization proximately caused the termination of that contract." Appellants argue that, instead, these posts "are actually express acknowledgments by [appellants] that the efforts of the entire community— 'local activists,' 'concerned citizens,' and the public generally—made 'victory' possible, not [the TCE or Schneider] individually." Appellants contend that "[t]he record supports [the] statement; the TCEQ estimates that 150 people attended the public meeting discussing the contract and thirty-two individuals provided formal oral comments expressing concern with the City's plans." Appellants argue that many "organizations and individuals took active roles in the 'victory' that [PDI] erroneously claims—without any support whatsoever—caused ... Rio Hondo to cancel its contract with [PDI]." We disagree.

In this case, PDI is only required to establish each element by clear and specific evidence, until its effect is overcome by other evidence. See TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(b), (c); Rehak, 404 S.W.3d at 726. While our review of the evidence reveals that other persons and entities expressed concern about Rio Hondo's plans, we cannot conclude that the evidence provides only mere guess or conjecture as to proximate cause, as appellants argue.

The evidence reveals that after public meetings where the TCE representatives advocated their position to keep liquid waste out of Rio Hondo's wastewater treatment plant, Rio Hondo cancelled its contract with PDI for a dewatering plant. More specifically, in response to appellants' motion to dismiss, PDI relied on the affidavit of Carter Mayfield, PDI's Director of Finance and financial analyst. In his affidavit, Mayfield averred that Rio Hondo officials had a private meeting with PDI following the January 13, 2013 public meeting where the TCE representatives advocated the TCE's position to the public. Mayfield explained that at the private meeting City Council member Gerald Hertzog "said that he felt like the deal had gone 'sour.' And that we should just walk away.... He said that it didn't matter [if PDI's leaving would be the best thing for the city] at this point, that the 'environmental group' had people all wound up over this." Dobbs and others represented the TCE at the TCEQ's public meeting in Rio Hondo on January 17, 2013, where they handed out instruction sheets for the audience's participation. According to Mayfield's affidavit, on February 17, 2013, Rio Hondo held a City Council meeting where the decision was made to "cancel" the contract between Rio Hondo and PDI. And then on February 28, 2013, Rio Hondo sent a letter to the TCE informing it of the cancellation of PDI's contract. Appellants acknowledge, on appeal, that the efforts of its organizers generated thirty-six letters to the Mayor, City Commissioners, area state legislators, and the TCEQ. And PDI claimed in its petition that "prior to the TCE coming into Rio Hondo, there was no public opposition and City officials had no concerns over PDI's contract with the City or its plans to operate the dewatering facility at the City's wastewater treatment plant."

Viewing the evidence set out above, we conclude that PDI has provided clear and specific evidence that the TCE's acts were a substantial factor in bringing about the termination of the contract—satisfying its burden on the component element of cause

in fact. *See Nixon,* 690 S.W.2d at 549; *Richardson–Eagle,* 213 S.W.3d at 474. There was also clear and specific evidence that the TCE should have anticipated the dangers that its acts created for PDI— satisfying PDI's burden on foreseeability. *See Portlock,* 852 S.W.2d at 583.

### c. Damages

■ As to the damages element of PDI's tortious-interference-with-a-contract claim, appellants contend that the documents provided by PDI in support of its claim for past and future damages were "mere conclusory averments with no probative force," and therefore, PDI failed to provide clear and specific evidence of its damages. Again, we disagree.

PDI offered the affidavit of Carter Mayfield as support for its claimed damages. Paragraph X of Mayfield's affidavit set out the following facts and opinions regarding damages and referenced exhibits that were attached to the affidavit in support of the averments:

X. Damages to [PDI]

37. I performed a detailed financial analysis finalized December 11, 2007 to help determine financial impact of selecting various locations for expanding the footprint of SOS Liquid Waste Haulers, Ltd. Co. and [PDI].

38. The financial analysis does not separate out the expected profit of the expansion between the two companies because the proportion of the profit between the two companies is based solely on the transfer price for disposal set internally by [PDI]. As such, the profit to the owners of both companies is the same regardless of transfer price.

39. In the analysis, I assumed a discount rate of 8%. I updated the discounted cash flow analysis using current market sizes from [the] TCEQ MSW reports for the existing competitors as well as annual sell rates for PDI's LaCoste operation. Market size should grow at a faster clip with three competitors in the area. I also made the assumption that we would eventually be able to build to 55% market share in grease, which is SOS Liquid Waste Hauler's approximate logistical market share in the San Antonio area today. Grit market share is estimated to be higher because Valley Dewatering is not allowed to accept grit and LES does not aggressively pursue the grit market.

*See* attached Exhibit 5 for the detailed financial model. Pursuing the project would lead to accretion of approximately $6.5MM in value; therefore, an inability to pursue the project resulted in an economic loss of $6.5MM[.]

40. In addition to the value lost by not being able to bring the plant to fruition, PDI sunk approximately $300,000 into the plant up until the point that the City of Rio Hondo cancelled the contract. *See* Exhibit 6 for a breakdown of the costs already expended.

In other words, Mayfield concluded that future damages totaled $6.5 million. In his affidavit, Mayfield discussed his detailed financial model, titled "SPS Valley Expansion Financial Model," from which he determined the amount of future damages. He explained that he created this document in 2007 "to help determine [the Net Present Value or the] financial impact of selecting various locations for expanding the footprint" of SOS and PDI. The model, attached to Mayfield's affidavit as Exhibit 5, set out the considerations upon which he

based future damages.[19] The model applied the figures to a period from 2013 through 2018.

Mayfield also concluded in his affidavit that PDI incurred more than $300,000 in costs up to the time Rio Hondo cancelled the contract. In support of his conclusion, Mayfield attached a document that set out money spent on the project during that time. Line items identified by Mayfield as costs already expended included the following: (1) an estimate for registration development, review, and administration; (2) an estimate for a registration helper/consultant; (3) a PR consultant; (4) an engineer; (5) the public meeting notice; (6) direct payment to Rio Hondo; and (7) the Rio Hondo truck parking lot.

Regarding the facts set out in Mayfield's affidavit and the attached documents, we cannot conclude that they were obscure or ambiguous. They were easy to perceive and to determine with certainty for the projections made. The evidence was explicit. It related to PDI's finances and the Rio Hondo dewatering plant. And the conclusions regarding future and past damages were characterized by formulation, applying the method of calculation to the figures set out in the documents. *See Serafine*, 466 S.W.3d at 358. They were not conclusory, *see id.* or "bare, baseless opinions." *In re Lipsky*, 460 S.W.3d at 592. The opinions had a reasoned basis, which Mayfield discussed in his affidavit. *See id.* at 593. Mayfield explained how he

arrived at his total amount of future and past damages. He linked the total amount of damages to specific figures that he used to arrive at his totals. So we conclude that PDI's evidence satisfies the minimum requirements of the TCPA as to this damage element. *See id.* at 590.

### 3. Summary

Because PDI established a prima facie case by clear and specific evidence for each essential element of its tortious interference claim, we overrule appellants' first issue.

### B. PDI's Business Disparagement Claim

■ By their second issue, appellants contend that dismissal is mandated on PDI's business disparagement claim because PDI failed to establish all elements by clear and specific evidence. To prevail on a business disparagement claim the plaintiff must establish that (1) the defendant published disparaging words about the plaintiff's economic interests (2) with malice, (3) without privilege, (4) that resulted in special damages. *Forbes, Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex.2003).

■ Regarding the first element, PDI complains that each of the following allegedly disparaging statements made by appellants "was false or was intended to allow a reasonable person to perceive a false

19. Appellants complain that because the record contains no evidence to verify the assumptions upon which Mayfield relied, his opinion regarding future damages is not competent evidence. We find appellants' argument in this appeal to be unpersuasive. The task of offering a future-damages opinion, out of necessity, requires the witness to make reasonable assumptions. *See N. Cypress Med. Ctr. Operating Co., Ltd. v. St. Laurent*, 296 S.W.3d 171, 177–78 (Tex.App.—Houston [14th Dist.] 2009, no pet.). Moreover, "[a prima facie case] refers to evidence sufficient as a matter of law to establish a given fact if it is not rebutted or contradicted." *In re Lipsky*, 460 S.W.3d 579, 590 (Tex.2015) (orig.proceeding). Because the assumptions set out in the model are clear and specific, we conclude that they are reasonable assumptions upon which to determine future damages if they are not later rebutted, contradicted, or found to be inconsistent with undisputed facts. *See id.; see also N. Cypress Med. Ctr. Operating Co.*, 296 S.W.3d at 177–78.

impression": (1) PDI had an unsatisfactory compliance record with the TCEQ for the LaCoste facility; (2) PDI does not comply with the laws of Texas; (3) PDI would accept toxic liquid waste or toxic industrial waste; and (4) LaCoste residents had to boil their water to avoid getting sick after a wastewater plant discharge. However, even had appellants published disparaging words about PDI's economic interests, we cannot conclude that PDI provided clear and specific evidence that appellants made those statements with malice. *See id.*; *see also* Tex. R. App. P. 47.1. So our review begins with the second element of this claim—malice. *See Forbes*, 124 S.W.3d at 170.

■■■ To establish "actual malice," a plaintiff claiming business disparagement must prove that the defendant made a statement "with knowledge that it was false or with reckless disregard of whether it was true or not." *Id.* at 171 (internal quotations omitted). Reckless disregard must be established by evidence that the defendant entertained serious doubts as to the truth of the statements made. *Fluor Enters., Inc. v. Conex Int'l Corp.*, 273 S.W.3d 426, 439 (Tex.App.—Beaumont 2008, pet. denied). The actual malice determination thus focuses on the defendant's state of mind at the time of the publication. *Forbes*, 124 S.W.3d at 173. "An error in judgment is not enough" to establish reckless disregard. *Casso v. Brand*, 776 S.W.2d 551, 563 (Tex.1989). "Mere negligence is not enough." *Forbes*, 124 S.W.3d at 171–72.

PDI claims that appellants acted with malice because Schneider should have known the statements were not true. It argues that Schneider should have known because she "led the TCE for years[ ] and it is very simple to get an entity's compli-

ance history from the TCEQ" and because the "TCE published PDI's entire application on its website," which "clearly provided that no hazardous or toxic waste would be handled at its facility; yet, [the] TCE and its agents stated the opposite." PDI also claims that appellants acted with malice because no one at the TCE called "LaCoste to see why it published a boil water notice." By its argument, PDI points to resources, including the TCEQ website and LaCoste officials, that it alleges appellants should have consulted before making the complained-of statements.

■■■ We are not persuaded by PDI's arguments because an actual malice determination in the context of a disparagement claim focuses not on what the defendant should have done or did not do. *See id.*; *Casso*, 776 S.W.2d at 563. It does not focus on what a defendant would have known had it researched the matter. Instead, when establishing malice the focus is on the speaker's state of mind at the time of the publication. *See Forbes*, 124 S.W.3d at 173. And in this case, we cannot conclude that PDI has shown by clear and specific evidence that appellants either knew the statements to be false or entertained serious doubts as to the truth of the statements made. *See id.*; *Fluor Enters.*, 273 S.W.3d at 426.

Because PDI has not shown clear and specific proof that appellants made the allegedly defamatory statements with malice, it did not sustain its burden of proof on the malice element of its business disparagement claim. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.005(c).[20] We sustain appellants' second issue.

## V. Conclusion

In this case, TCE and Schneider's motion to dismiss PDI's claims was denied by

---

**20.** Because PDI did not establish the malice element of its business disparagement claim, we need not address the remaining elements. *See* Tex. R. App. P. 47.1.

operation of law. We affirm in part the denial of the motion on PDI's tortious interference with an existing contract claim. We reverse in part the denial of the motion on PDI's business disparagement claim and remand the case to the trial court for further proceedings to determine any attorney's fees, costs, and expenses, and to order dismissal of PDI's business disparagement claim.