

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

_____

No. 07-21-00005-CV

_____

MARK LEE DICKSON AND RIGHT TO LIFE EAST TEXAS, APPELLANTS

V.

LILITH FUND FOR REPRODUCTIVE EQUITY, APPELLEE

On Appeal from the 53rd District Court
Travis County, Texas
Trial Court No. D-1-GN-20-003113, Honorable Amy Clark Meachum, Presiding

September 2, 2021

## MEMORANDUM OPINION

Before QUINN, C.J., and PARKER and DOSS, JJ.

"Abortion is Freedom," so said Lilith. "'Abortion is Freedom' in the same way that a wife killing her husband would be freedom – Abortion is Murder," so said Dickson. "Roe v. Wade, 410 U.S. 113 (1973) . . . and any other rulings or opinions from the Supreme Court that purport to establish or enforce a 'constitutional right' to abort a pre-born child, are declared to be unconstitutional usurpations of judicial power," so said the City of Waskom. And, a municipal ordinance purporting to criminalize abortion, which ordinance

the litigants concede the municipality lacked authority to enact. These circumstances underlie the defamation suit from which this appeal arose. But, does the debate surrounding them depict defamation or protected opinion? That is the dispositive question before us.

In 2019, the City of Waskom, in Harrison County, Texas, enacted a municipal ordinance decrying *Roe* and outlawing abortion in all but a few forms. Other rural cities followed suit. Under the ordinance, entities participating or facilitating abortions were also designated to be criminal organizations. Mark Lee Dickson, an outspoken advocate for the ordinance, accused the Lilith Fund for Reproductive Equity of being a criminal organization and committing murder under that ordinance because it helped others obtain abortions permissible within the scope of *Roe*. Lilith returned volley by purchasing a billboard in Waskom declaring "Abortion is Freedom." Dickson then referred to the billboard in describing Lilith (and NARAL Pro-Choice Texas) as "advocates for the murder of those innocent lives."

Lilith sued Dickson and the entity he represented, Right to Life East Texas, for defamation and conspiracy. Would a person of reasonable intelligence and learning, and who uses care and prudence in evaluating circumstances believe Dickson is alleging Lilith committed a criminal act? The answer to that question controls the disposition of this appeal. We answer "no" because the accusation is an "opinion masquerading as fact" under the entire context of the conversation being had.

The appeal comes to us as another mole to show its head in the field laid by the Texas Citizens Participation Act (TCPA).[1] TEX. CIV. PRAC. & REM. CODE ANN. § 27.001

---

[1] *See Western Mktg. v. AEG Petroleum, LLC*, 616 S.W.3d 903, 909 (Tex. App.—Amarillo 2021, pet. filed) (describing an interlocutory appeal involving the TCPA as mimicking "a game of 'whack-a-mole';

2

*et seq.* (West & Supp. 2020). The trial court denied, through silence, the motion of Dickson and Right to Life East Texas (East TX) to dismiss the defamation and conspiracy suit. In denying their TCPA motion, the trial court allegedly erred. We agree, reverse, and remand.[2]

We do not belabor disposition of the appeal by dissertation on the standard of review applicable in TCPA appeals. Others have expounded upon it at sufficient length. *See, e.g.*, *Adams v. Starside Custom Builders, LLC*, 547 S.W.3d 890, 891 (Tex. 2018) (discussing same); *Zilkha-Shohamy v. Corazza*, No. 03-20-00380-CV, 2021 Tex. App. LEXIS 5698, at *8–11 (Tex. App.—Austin July 16, 2021, no pet. h.) (mem. op.) (same); *Casey v. Stevens,* 601 S.W.3d 919, 922–24 (Tex. App.—Amarillo 2020, no pet.) (doing same).

Furthermore, all parties agree that the TCPA applies. The debate concerns two areas, though. One involves whether Lilith established a prima facie case for each element of its claims through clear and specific evidence. TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c) (stating that a court may not dismiss a legal action if the party bringing it "establishes by clear and specific evidence a prima facie case for each essential element of the claim in question"). The other concerns whether Dickson established an affirmative defense or other ground entitling him to dismissal as a matter of law. *Id.* § 27.005(d) (obligating the trial court to dismiss the action "if the moving party establishes an affirmative defense or other grounds on which the moving party is entitled to judgment

---

as soon as the court disposes of one, another pops up. And each leads down the tortuous winding TCPA mole-hole").

[2] Because this appeal was transferred from the Third Court of Appeals, we are obligated to apply its precedent when available in the event of a conflict between the precedents of that court and this Court. *See* TEX. R. APP. P. 41.3.

3

as a matter of law"). Irrespective of whether approached as an element of defamation or a defense to it, the result is the same. On the record before us, we conclude as a matter of law that Dickson's comments were inactionable opinion as discussed below.

We begin our journey through the mole field by addressing argument pertaining to the elements of defamation. Dickson contends that Lilith failed to establish a prima facie case on each one. The elements of the claim consist of 1) the publication of a false statement of fact to a third party, 2) that was defamatory and concerned the plaintiff, and 3) was made with the requisite degree of fault. *Dallas Morning News, Inc. v. Hall*, 579 S.W.3d 370, 377 (Tex. 2019); *Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 623 (Tex. 2018). Such a statement of fact must be more than false, abusive, unpleasant, or objectionable; it must be defamatory. *Rehak Creative Servs. v. Witt*, 404 S.W.3d 716, 728 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). It must be of the ilk that tends to injure one's reputation and "expose the person to public hatred, contempt or ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation or to publish the natural defects of anyone and thereby expose the person to public hatred, ridicule, or financial injury." TEX. CIV. PRAC. & REM. CODE ANN. § 73.001 (West 2017); *Rehak Creative Servs.*, 404 S.W.3d at 728. And, whether the statement can be viewed as such involves an objective, not subjective, assessment. *Id.* In other words, we look at it through the eyes of an ordinary prudent person with ordinary intelligence and assess how that person would perceive it when viewing its entire context. *Carr v. Brasher,* 776 S.W.2d 567, 570 (Tex. 1989) (stating that the allegedly libelous statement must be construed as a whole, in light of surrounding circumstances based upon how a person of ordinary intelligence would perceive the entire statement); *Freiheit v. Stubbings*, No. 03-

4

12-00243-CV, 2014 Tex. App. LEXIS 13889, at *5 (Tex. App.—Austin Dec. 31, 2014, no pet.) (mem. op.) (quoting *Carr*, 776 S.W.2d at 570). Such a person is neither "omniscient" nor a "dullard." *See Rehak Creative Servs.*, 404 S.W.3d at 728. An ordinary prudent person is one who uses care and prudence when evaluating circumstances and one who has reasonable intelligence and learning. *Id.* And, unless the words in play are ambiguous, our assessment of their potential for defaming implicates a question of law, *id.* at 728–29, which frees us from deferring to the trial court's interpretation. *Gulf Chem. & Metallurgical Corp. v. Hegar*, 460 S.W.3d 743, 747–48 (Tex. App.—Austin 2015, no pet.) (stating that the reviewing court does not defer to the trial court on questions of law); *see also Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d at 624 (stating that if the court determines the language of the statement is ambiguous then a jury should decide the statement's meaning).

We reemphasize that the obligatory viewpoint is that of the ordinary prudent person considering the entire context of the words. That context generally includes more than the words themselves. A myriad of circumstances, including such things like "accompanying statements, headlines, pictures, and the general tenor and reputation of the source itself" help define that context. *City of Keller v. Wilson*, 168 S.W.3d 802, 811 (Tex. 2005); *Rehak Creative Servs.*, 404 S.W.3d at 729.

Another matter bears mentioning before we turn to our analysis. It concerns certain forms of words or phrases which, again from their context, are opinions or rhetorical hyperbole. Neither may be actionable. *See Scripps NP Operating, LLC v. Carter,* 573 S.W.3d 781, 795 (Tex. 2019) (discussing when opinion may be non-actionable); *Backes v. Misko*, 486 S.W.3d 7, 26 (Tex. App.—Dallas 2015, no pet.)

5

(observing that rhetorical hyperbole is inactionable).  The former fall within two categories.  The first category encompasses statements which are not verifiable as false.  *Scripps NP Operating, LLC*, 573 S.W.3d at 795; *Dallas Morning News, Inc. v. Tatum,* 554 S.W.3d at 639.  The second encompasses statements which may be verifiable as false but their entire context nevertheless reveals them to be merely opinions masquerading as fact.  *Scripps NP Operating, LLC*, 573 S.W.3d at 795; *Dallas Morning News, Inc. v. Tatum,* 554 S.W.3d at 639.  As said in *Dallas Morning News*, "statements that cannot be verified, as well as statements that cannot be understood to convey a verifiable fact [given their entire context], are opinions."  *Dallas Morning News, Inc. v. Tatum,* 554 S.W.3d at 639.  And, whether the utterances at issue fall within either category also entails a question of law.  *Id.*

As for rhetorical hyperbole, such often are characterized as extravagant exaggerations utilized for rhetorical effect, *Campbell v. Clark*, 471 S.W.3d 615, 626–27 (Tex. App.—Dallas 2015, no pet.); *ABC, Inc. v. Gill*, 6 S.W.3d 19, 30 (Tex. App.—San Antonio 1999, pet. denied), or vigorous epithets.  *Greenbelt Coop. Pub. Ass'n v. Bresler*, 398 U.S. 6, 14, 90 S. Ct. 1537, 26 L. Ed. 2d 6 (1970).  Indeed, a sister court recently described such speech statements that an "ordinary reader" would view as an overstatement or rhetorical flourish and unintended to be taken literally.  *Dickson v. Afiya Ctr.*, No. 05-20-00988-CV, 2021 Tex. App. LEXIS 6261, at *37 (Tex. App.—Dallas Aug. 4, 2021, no pet. h.) (mem. op.).  We read that court's reference to an "ordinary reader" as meaning the reasonable person to which we previously alluded; after all, it is the eyes of that person through which we peer in gauging whether statements are defamatory.  And,

6

as with opinions, whether an utterance is rhetorical hyperbole, given its context, is a question of law. *See id.* at *11.

We now turn to our analysis of the statements underlying Lilith's suit. They were uttered over a period of time and generally related to the aforementioned ordinance and in response to Lilith's own advocacy. For instance, Dickson congratulated Waskom for being the first to become a sanctuary city, proclaimed that abortion was "outlawed" there, and noted that organizations which perform or assist with obtaining abortions were "criminal organizations." The litany of organizations identified in his message included Lilith. Two other statements by Dickson were:

> "Abortion is Freedom" in the same way that a wife killing her husband would be freedom - Abortion is Murder. The Lilith Fund and NARAL Pro-Choice Texas are advocates for abortion, and since abortion is the murder of innocent life, this makes these organizations advocates for the murder of those innocent lives. This is why the Lilith Fund and NARAL Pro-Choice Texas are listed as criminal organizations in Waskom, Texas. They exist to help pregnant Mothers murder their babies.

> [and]

> Nothing is unconstitutional about this ordinance. Even the listing of abortion providers as examples of criminal organizations is not unconstitutional. We can legally do that. This is an ordinance that says murdering unborn children is outlawed, so it makes sense to name examples of organizations that are involved in murdering unborn children. That is what we are talking about here: The murder of unborn children. Also, when you point out how the abortion restrictions in 2013 cost the State of Texas over a million dollars, you should also point out how many baby murdering facilities closed because of those restrictions. We went from over 40 baby murdering facilities in the State of Texas to less than 20 baby murdering facilities in the State of Texas in just a few years. Even with the win for abortion advocates with *Whole Woman's Health v. Hellerstedt*, how many baby murdering facilities have opened back up? Not very many at all. So thank you for reminding us all that when we stand against the murder of innocent children, we really do save a lot of lives.

7

All of the foregoing statements pertain to the campaigns of Dickson and East TX to end abortion and pursue the reversal of *Roe v. Wade*. No one can reasonably deny that both topics have been the stuff of ever-increasing discussion and attention even before 1973. Nor can one reasonably deny that abortion and the Supreme Court's decisions on the issue trigger emotional, intellectual, moral, and religious debate.[3] They have and will continue to do so.[4] They have and will continue to influence elections and legislation. One within the legal standard of neither a dullard nor omniscient but, rather, of reasonable intelligence and learning who utilizes care and prudence in evaluating circumstances would know that to be an accurate assessment of the debate's effect.

Similarly, those involved on both sides of the debate have utilized colorful rhetorical devices to garner attention to the issues. On the "pro-choice" side, for example, Lilith refers to abortion as being "freedom." On the "pro-life" side, medical personnel have been called "murderers."[5] The same is true of mothers undergoing an abortion.[6] No doubt,

---

[3] *See* Frank Pavone, *Democrats Exalt Their Woman, Pope Francis Exalts His: Column*, USA TODAY, Sept. 4, 2016, https://www.usatoday.com/story/opinion/2016/09/04/mother-teresa-clinton-abortion-francis-democratic-platform-hyde-amendment-beautification-column/89729254 (describing Mother Teresa's stance on abortion as expressed during a National Prayer Breakfast).

[4] Treva B. Lindsey, *A Concise History of the US Abortion Debate*, THE CONVERSATION, June 10, 2019.

[5] *See, e.g.*, Alexa N. D'Angelo, Supporters, Opponents Rally at Planned Parenthood Sites in Arizona, U.S., THE REPUBLIC, Aug. 22, 2018, https://www.azcentral.com/story/news/local/phoenix/2015/08/22/supporters-opponents-rally-planned-parenthood-sites-arizona-us/32203591/; Diana Pearl, *Free Speech Outside the Abortion Clinic*, THE ATLANTIC, Mar. 19, 2015, https://www.theatlantic.com/health/archive/2015/03/free-speech-outside-the-abortion-clinic/388162/; Michael Sheridan, *Rep. Randy Neugebauer: I Yelled 'Baby Killer' During Rep. Bart Stupak's Speech*, NY DAILY NEWS, Mar. 22, 2010, https://www.nydailynews.com/news/politics/rep-randy-neugebauer-yelled-baby-killer-rep-bart-stupak-speech-article-1.173917.

[6] *See* Frank Pavone, *Democrats Exalt Their Woman, Pope Francis Exalts His: Column*, USA TODAY, Sept. 4, 2016, https://www.usatoday.com/story/opinion/2016/09/04/mother-teresa-clinton-abortion-francis-democratic-platform-hyde-amendment-beautification-column/89729254 (reiterating Mother Teresa's statement that "[T]he greatest destroyer of peace today is abortion, because it is a war against the child, a direct killing of the innocent child, murder by the mother herself. And if we accept that a mother can kill even her own child, how can we tell other people not to kill one another?").

8

many uttering these words believe in their accuracy, advocate for others to believe it, and have the ability to rationally explain the basis of their belief. Yet, as Lilith implicitly acknowledged, a reasonable person would understand the label to be a non-defamatory opinion or hyperbole given its context.[7]

Another item of context involves the ordinance itself. Its constitutionality is not before us. Nevertheless, the municipal edict frames Dickson's comments. Several observations warrant mention. First, Dickson represented to this Court through his attorney that 1) "because Waskom is a city, it doesn't have the power to create crimes under city law"; 2) "[t]hat is only something the state legislature can do"; and 3) "Waskom doesn't have the authority to make something a crime."[8]

Moreover, the Waskom city council described *Roe* as "a lawless and illegitimate act of judicial usurpation, which violates the Tenth Amendment by trampling the reserved powers of the States and denies the people of each State a Republican Form of Government by imposing abortion policy through judicial decree." Nevertheless, enforcement of the alleged criminal aspect of the ordinance was expressly conditioned upon the rescission of *Roe.* The pertinent language consisted of the city council saying that 1) "no punishment shall be imposed upon the mother of the pre-born child that has been aborted" and 2) "[i]f (and only if) the Supreme Court overrules *Roe v. Wade*, 410 U.S. 113 (1973), and *Planned Parenthood v. Casey*, 505 U.S. 833 (1992), a corporation or entity that commits an unlawful act described in Section C shall be subject to the

---

[7] Lilith wrote in its appellee's brief that "[g]enerally calling abortion 'murder' alone is not defamatory."

[8] Because Dickson conceded that Waskom lacked the authority to criminalize abortion, he was actually referring to the Texas statute implicated in *Roe.* Yet, the latter was not a part of the context underlying his comments. He never mentioned the statute in them, only the Waskom ordinance.

9

maximum penalty permitted under Texas law for the violation of a municipal ordinance governing public health, and each violation shall constitute a separate offense." Conditioning the imposition of any criminal penalty on the rescission of the very Supreme Court precedent the body attacked is novel. Without the risk of punishment being levied, it is unclear if anyone possesses standing to challenge the constitutionality of the ordinance's penal effect before a court for final adjudication. At the same time, it arguably permits individuals to refer to the corporations in terms suggesting illegal conduct. As noted above, the constitutionality of the ordinance is not being challenged on appeal.

Third, while Texans are not presumed to agree with the law, they are presumed to know it. *See S. C. v. Tex. Dep't of Family & Protective Servs.*, No. 03-19-00965-CV, 2020 Tex. App. LEXIS 9122, at *6 (Tex. App.—Austin Nov. 18, 2020, no pet.) (mem. op.) (quoting *E.H. Stafford Mfg. Co. v. Wichita Sch. Supply Co.*, 118 Tex. 650, 655, 23 S.W.2d 695, 697 (1930)). The proverbial reasonable person alluded to earlier would presumably have that knowledge as well. And, an aspect of that knowledge consists of the United States Constitution prescribing that it is "the supreme Law of the Land." U.S. CONST. art. VI, cl. 2. Another aspect consists of the dictate that the United States Supreme Court is the arbiter of what the Constitution says. *See Marbury v. Madison*, 5 U.S. 137, 2 L. Ed. 60 (1803). One cannot escape nor ignore the effect of those legal principles; so, a reasonable person would or should know that a municipality cannot itself reverse Supreme Court precedent such as *Roe* and punish that which it allowed. Waskom acknowledged as much by expressly conditioning the punitive effect of its ordinance on the vitiation of *Roe.*

10

Again, all the foregoing depicts the context of Dickson's words when pursuing his campaign to end abortion and inspire the eventual nullification of *Roe*. And, that context leads us to conclude that a reasonable person of ordinary learning would deem his accusation about Lilith being a criminal entity engaged in criminal acts as opinion masquerading as a statement of fact uttered in the course of advocating for a change in law. His words differ little from language that even Lilith admits is inactionable, that is, language which likens individuals who facilitate abortion as murderers. Nor does his allusion to the Waskom ordinance as basis for his accusation change our view. The ordinance itself describes abortion as murder, just as many protesters have done over the decades.

Simply put, Dickson's comments were made within the context of a political, ethical, moral, and legal stage built in part by the Waskom city council. He expounded about how Waskom "got it right" in purporting to outlaw abortion while also castigating *Roe* and the court rendering the decision. He urged others to believe that those facilitating abortion were criminals much in the same way that others liken those who perform abortions to murderers. Members on both sides of the debate no doubt believe their positions to be true. Members on both sides offer argument rationalizing their respective positions. And, no doubt, some may well believe Dickson when saying that Lilith is a criminal organization because Waskom enacted an ordinance purporting to nullify Supreme Court precedent. Yet, the legal standard by which we must abide is the "reasonable person." He or she "'does not represent the lowest common denominator, but reasonable intelligence and learning. He or she can tell the difference between satire and sincerity.'" *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 157 (Tex. 2004) (quoting

11

*Patrick v. Superior Court,* 22 Cal. App. 4th 814, 821, 27 Cal. Rptr. 2d 883, 887 (1994))*.* And, "the question [becomes] not whether some actual readers [or listeners] were [misled], as they inevitably will be, but whether the hypothetical reasonable reader could be." *Id.* Putting aside subjective beliefs, we focus on the single objective inquiry of whether the utterance can be reasonably understood as stating actual fact. *See id.* (involving satire). Even if what Dickson uttered could be characterized as statements of fact and even if some readers were to believe them, the context surrounding those utterances would lead a reasonable person of ordinary learning with a penchant for reasonable investigation to see them as opinion masquerading as fact or rhetorical hyperbole masquerading as fact.

Moreover, their entire context is the circumstance which causes us to disagree with the recent conclusions of our sister court in *Dickson v. Afiya Center*. The panel writing that opinion deemed statements uttered by Dickson (mirroring those said here) to be statements of fact rather than opinion. It so concluded because it found them to be verifiable. *Dickson v. Afiya Ctr.*, 2021 Tex. App. LEXIS 6261, at *11–13. And, they were verifiable because they purported to represent the status of the criminal law in Texas while existing penal provisions could verify their accuracy or inaccuracy. *Id.* Yet, as mentioned earlier, non-actionable opinion may take two forms, according to our Supreme Court in *Dallas Morning News.* One encompasses statements of fact subject to verification. That is the category upon which the *Afiya Center* court relied. It said nothing of the second category, that being comments appearing to be statements of fact subject to verification but by their entire context are nothing other than opinion masquerading as

12

fact. That is the category in which we conclude that Dickson's comments fall, as a matter of law.

Admittedly, we agree with the *Afiya Center* panel when it says that simply interjecting the word "abortion" into the discussion does not *ipso facto* make the statements inactionable opinion. Falsely accusing one of "robbing a bank to fund an abortion protest" most likely would not insulate the defamation about robbing a bank merely because the word "abortion" were interjected into the passage. That is not what we have here, though. As explained earlier, Dickson's words were part of the abortion debate itself, as was the municipal enactment to which he referred and which supported his viewpoint. That context is what the *Afiya Center* did not address, and that context is an indisputable part of the entire canvas upon which he left his words.

The same is no less true of the panel's conclusion regarding rhetorical hyperbole. It found that his words were not such because a reasonable person could believe that Dickson "intended the statements literally." *Id.* at *39. A person outside an abortion clinic yelling that those inside are "murderers" no doubt believes and wants others to believe that terminating a fetus' viability is intentionally killing a human life, i.e., murder. If what some person speaking the words believed and intended alone were the test then he or she would be engaging in defamation under the *Afiya Center* analysis. Yet, the focus is not on what the speaker intended but what a reasonable person would believe, given the context involved. The *Afiya Center* panel does not consider the entire context of Dickson's words but only whether he intended them to be taken literally. That is an inaccurate focus. Again, the context of words is all important.

13

Being opinion, the comments uttered by Dickson and upon which Lilith based its suit are inactionable. They being inactionable, East TX's purported conspiracy to engage in publishing them is equally inactionable. Consequently, the trial court erred in failing to dismiss Lilith's suit under the TCPA.

Thus, we reverse the trial court's *sub silentio* decision denying dismissal and render judgment dismissing the claims of defamation and conspiracy averred by the Lilith Fund for Reproductive Equity against Mark Lee Dickson and Right to Life East Texas. We also remand the cause to the trial court with directions to 1) award Dickson and Right to Life East Texas court costs and reasonable attorney's fees per § 27.009(a)(1) of the Texas Civil Practice and Remedies Code and 2) determine sanctions, if any, per § 27.009(a)(2) of the same.


Brian Quinn
Chief Justice